# WASHINGTON COUNTY.

---

ASA GEORGE *v.* SAMUEL P. WOODWARD AND LEANDER FOSTER.

[CROSS-BILL.]

LEANDER FOSTER *v.* ASA GEORGE AND HARRIS BUGBEE.

[ IN CHANCERY. ]

*Assignment. Agency. Bill of Sale. Negligence.*

The general owner of notes, held by his creditor as collateral security, who exchanges them for other securities with the consent of his creditor, acts as a principal dealing with his own property, and not as the agent of his creditor, and his contracts in relation thereto will be carried out, and cannot be impeached by such creditor, when the contract does not impair his security.

Where a bill of sale of personal property being held by a creditor as collateral security for a debt due him, is assigned by the person for whom it is held as security, with the consent of the creditor, under an agreement that the assignee is not to have the care of the property, and that he should not be accountable except for so much of it as he should receive, it remains the duty of the assignor to see that the property is kept and disposed of according to the bill of sale, and the assignee having done nothing to prevent its being so disposed of, he will not be liable for any loss in relation thereto.

PETITION FOR FORECLOSURE, brought by Asa George against Samuel P. Woodward and Leander Foster. The petition was taken as confessed, as against Woodward, for want of an answer. Foster answered the petition and brought a cross-bill against George and one Harris Bugbee, to which George and Bugbee answered separately.

That on the 26th day of March, A. D. 1860, Harris Bugbee was indebted to Asa George, to a large amount, which had been running for a long time ; that said Bugbee owned about sixty acres of land

in Northfield; on the said 26th day of March, 1860, he sold and conveyed said land to one Samuel P. Woodward for the sum of eleven hundred dollars, and for the purpose of securing the debt due from Bugbee to George, the said Bugbee procured said Woodward to execute to said George, eight promissory notes, payable to Asa George, or order, secured by two mortgages of the said land, one of said mortgages being conditioned for the payment of three of said notes for one hundred dollars each, one payable March 1st, 1861, one March 1st, 1862, and the other March 1st, 1863.

The other mortgage was conditioned for the payment of the five remaining notes, four of them being for one hundred and fifty dollars each, and the other for two hundred dollars, and payable at different times, but all subsequent to March 1st, 1863. The said Woodward also, on the same day, made and executed to said George a bill of sale of a number of articles of personal property as further security for the payment of the three notes first to become due. All of which notes, mortgages and bill of sale were taken and received by said George as security for the amount due him from Bugbee.

Before the fourth day of September, 1860, the said Bugbee entered into negotiations with said Foster for the purchase of a saw mill, and other real estate for the sum of six hundred dollars, and procured said George to make and execute to Foster on September 4th, 1860, an assignment of the mortgage conditioned for the payment of the three notes first to become due, with the notes, and the aforesaid bill of sale, also of two of the aforesaid one hundred and fifty dollar notes secured by the second mortgage, and endorsed on the second mortgage, an assignment of said notes, and on same day Foster made and executed to said George a deed of said mill and other property. The personal property remained in the possession of said Woodward, and was by him used up or disposed of. George and Bugbee claimed that the contracts entered into between Bugbee and Foster, created no priority of right in Foster, that George gave Bugbee no authoity to create a priority by contract, and that no contract was made giving such priority; that Foster should be decreed to apply the value of the personal property described in said bill of sale in payment of the three first notes, and also claimed a payment

by Woodward of one of the one hundred and fifty dollar notes. Foster claimed an express contract with Bugbee for priority of right, and that one Averill was employed by them to draw up writings which would meet that end, denied ever having received any of said personal property, or any pay on the notes he held, and claimed that the effect of an assignment of the notes and mortgage first to become due, operated to give him a priority over the balance of the last mortgage, and prayed for a decree of foreclosure against Woodward, George and Bugbee, and that the court should reform the written contracts so as to make them conform to the intent of the parties. Testimony was taken by both parties, which is sufficiently stated in the opinion of the court.

It appeared that Woodward had at some time quit-claimed these premises to Foster, and at the March Term, 1866, of the court of Chancery, upon full hearing of the case, PECK, Chancellor, ordered a decree of foreclosure in favor of George and Bugbee against Woodward for the amount due on the three notes held by said George as collateral security for his debt against Bugbee, and that Foster, orator in the cross-bill, have a decree for the other five notes mentioned in the mortgages, and proofs as assigned to him, without costs against Woodward in favor of either.

It was also further decreed, if Woodward did not redeem the premises by payment of the mortgage incumbrances if Foster had no priority of lien as between him and George and Bugbee, the parties would own the premises in common in proportion to the amount of their respective demands, but if Foster had a priority of lien, he is entitled to a decree of foreclosure against George and Bugbee. From the proof, the Chancellor decided that when Foster deeded to George the saw mill premises, and received therefor the notes, assignments and bill of sale, as before stated, there was an understanding between Foster and Bugbee that Foster should have a priority of lien on the mortgaged premises, and that as it appeared that George only held the same as collateral security for his debt against Bugbee, and that the saw mill premises were received and held by him in the same manner, that the saw mill premises were of equal value with the notes, and that Foster was the general owner of the

same, the Chancellor was of opinion that the lien of Foster was paramount to that of Bugbee and George, and it was ordered that Foster have a decree of foreclosure against Bugbee and George for the amount of his notes, to be operative in the event that Woodward did not redeem Foster's decree against him ; that in Foster's decree against Bugbee and George, Foster must account for the rents and profits of the mortgaged premises while in his possession, and for all money he may have received in payment, and that as Foster had not received anything under the bill of sale, he was not under the facts proved accountable for anything on account of it.

Neither party to recover costs.

A master was appointed to take an account on the basis of this decree.

Upon the coming in of the master's report, on the 25th day of April, 1867, the orators in the original petition filed a motion that the testimony of Foster as a witness taken before the order of reference and used before the master, be suppressed. The motion was overruled as it did not appear that the testimony was objected to before the master, and was introduced by the orators themselves.

The report of the master was accepted and confirmed at March Term, 1867, on decree entered in pursuance of the above decretal order.

The orator in the original petition appealed to this court.

*O. H. Smith*, for the orator.

*H. Carpenter*, for the defendant Foster.

The opinion of the court was delivered by

WILSON, J. The first question in the case, relates to the terms of the contract upon which the notes, mortgages and bill of sale were assigned and transferred to the defendant Foster. It is claimed by the petitioners that by the assignment and transfer of the five notes and mortgages to Foster, he acquired an interest in the mortgaged premises in common with Bugbee and George who own the other three notes, in such proportion as the amounts of their respective

demands bear each to the other; that Foster, by the assignment of the bill of sale and his custody of it, became obligated to exercise ordinary diligence in respect to the personal property, and that he should account for the same, on the notes to secure which the bill of sale was executed. The defendant Foster claims that it was mutu= ally agreed between him and Bugbee, that Foster should have the first lien upon the mortgaged premises; that the premises should be holden first for the payment of the notes transferred to him; that· they so represented the trade to Averill by whom the writings were drawn, and that Foster supposed the writings were made according to the agreement of the parties, as set forth in his answer and cross bill. It is further alleged by Foster that he took the bill of sale under an agreement that if he received any of the personal property, or its proceeds, he would account for the same, but that he was not obligated to look after the property, nor accountable for it except as above stated. The answer of Asa George admits that prior to and at the time of the assignment, he held the notes as collateral security for the payment of the note against Bugbee. George admits that Bugbee was authorized to trade with Foster, and let him have the notes; George was not present when the trade was negotiated, and does not claim to have any personal knowledge of the terms of the agreement, but he denies that Bugbee was authorized to give Foster a priority of lien. The answer of Bugbee denies Foster's statement of the terms of the contract, and claims that the contract, reduced to writing, is in accordance with the agreement and understanding of the parties. The testimony of Foster is direct and positive, and it tends to prove his statement of the contract, and the circumstances under which it was made. It appears from his testimony that his information, as to the value of the farm on which the notes were secured, was obtained just before the trade was closed, when he was informed by one residing in the vicinity of the farm, that it was worth about $600.; and it appears that Foster understood at the time the trade was closed that the security was good for the amount of the notes transferred to him, but that the premises were not sufficient in value to secure the payment of all the notes embraced in the mort-gages mentioned in said petition. This being the understanding of

Foster, as to the value of the mortgaged premises at that time, and it appearing that he did not rely very much, if at all, on the personal property, it is not very likely that he understandingly entered into a contract by the terms of which he would be liable to lose one half the amount of the notes taken by him for the mill property. The testimony of Sarah M. Bennett tends to prove the agreement insisted on by the orator Foster. Mr. Averill swears that Foster and Bugbee talked over the trade in his presence at the time the writings were made. This witness says he understood from Foster and Bugbee "that the $600. that Foster had, was to be the first secured on the farm." It is insisted by Bugbee, in and by his answer, that if Foster supposed the five notes transferred to him were a prior lien on the farm, it must have been an inference from the fact of their first becoming due, and not from any agreement of the parties. But the evidence tends to show that Foster undertook, by express contract, to secure a priority of lien, and that he did not rest his claim for such priority on the mere fact that the mortgage notes, to be transferred to him, were the first that would become due. Sarah M. Bennett testified that she understood from Foster and Bugbee that if the $600. which Foster held was not paid, he was to have the farm. Foster testified, among other things, as follows : " I stated the trade over to Mr. Averill and asked Bugbee if that was the trade, and he said it was. The trade was that he was to give me the first notes due, secured by the Woodward mortgages, amounting to six hundred dollars, besides the interest. The interest on them at that time amounted to about $15. It was expressly said there that I was to have the first six hundred dollars due on the mortgages, or that I should have the farm. Bugbee said I need not flatter myself that I should get the farm for $600., when he sold it for $1100. and had the $500. that come on after that, that he should take care that the payments were made to me when my notes become due." The testimony of Averill tends to show that Foster and Bugbee understood at the time the assignments were made that, by the terms of their trade, Bugbee could derive no benefit from the mortgages by way of security for the $500. in notes retained by him, unless the notes transferred to Foster were paid in full.

The evidence, we think, leaves no doubt that it was agreed by and between Foster and Bugbee that Foster should have a priority of lien on the mortgaged premises to secure the payment of the $600. specified in the five promissory notes transferred to him, and we think it was fully understood by them that Averill should make such writings as would give Foster a lien paramount to that of Bugbee and George. It does not appear that Foster read the mortgages or that he heard them read. The evidence as to whether the assignments were read to Foster, is not very satisfactory, but however the fact may be, it is clear that Foster relied upon Averill to examine the mortgages, and to write such assignments of them as would secure to Foster the full benefit of the mortgaged premises according to the terms of their agreement. The mistake complained of consists principally in the omission of Averill to insert in the assignments a stipulation that Foster should have a priority of lien, an omission which did not at the time attract his notice, as he was relying upon Averill to insert such provisions as would express the agreement and intention of the parties as declared by them at the time the assignments were made. It is said by the petitioners' counsel that Bugbee was not authorized as the agent of George to make the agreement insisted on by Foster. It appears that Bugbee was not the mere agent of George in making the trade, but he was and still is the general owner of the notes claimed by George. George only holds them as collateral security for his debt against Bugbee, who had the same interest in those he transferred to Foster. Bugbee, in making the trade, acted for himself and with reference to his own interest as the general owner of the notes; he also acted as the agent of George, so far as to protect and keep good the collateral security of George, which was the extent of his interest in, or claim on the notes, as against either Bugbee or Foster. But it is established by the evidence that the property deeded by Foster to George is of value equal to the amount of the notes transferred to Foster. George accepted that conveyance, he took and holds the premises so conveyed, as security in lieu of the notes transferred to Foster, so that George's security was not diminished by the trade. We are of opinion, under the circumstances of the case, that Foster holds a priority of lien as against both Bugbee and George.

2. As to the bill of sale, it appears that Foster accepted the delivery of it, under an agreement, by the terms of which he was wholly relieved from the care of the personal property, and not accountable except for such of it as he should receive. By the terms of that agreement Bugbee undertook to look after the personal property, and to see that the avails of it were applied according to the terms of the bill of sale, if Woodward failed to pay the notes according to their tenor. By that arrangement it became the duty of Bugbee to require Woodward to keep the property according to his agreement, and when he failed to pay the first note, Bugbee should have taken the necessary measures to dispose of the property, for the purposes for which it was pledged. There is no evidence in the case tending to show that Foster did anything to prevent the property from being disposed of as provided by the bill of sale; but it does appear that Bugbee wholly neglected his duty in that behalf, and, we think, the consequences of his neglect should not be borne by Foster.

3. It does not appear that any exceptions were taken to the master's report. The testimony taken by the master, upon which his finding is based, is not before us, we can, therefore, review only such questions as appear upon the face of the report. Upon the facts found by him we see no objection to the manner in which the account is taken.

The decree of the Chancellor is affirmed, and the cause is remanded to the Court of Chancery to be disposed of accordingly.