2012 VT 55

**Richard S. Daniels v. The Elks Club of Hartford, Vermont and The Human Rights Commission, et al.**

[58 A.3d 925]

No. 10-181

Present: **Reiber, C.J., Dooley, Skoglund and Burgess, JJ., and Cohen, Supr. J.,** Specially Assigned

Opinion Filed August 3, 2012

*C. Nicholas Burke* of *Burke & Hotchkiss, PLLC*, Lebanon, New Hampshire, for Plaintiff-Appellee.

*Gary F. Karnedy* and *Alexandra H. Clauss* of *Primmer Piper Eggleston & Cramer PC*, Burlington, for Intervenor-Appellee Mascoma Savings Bank.

*Edwin L. Hobson,* Burlington, *Robert Appel,* Executive Director, Vermont Human Rights Commission, Montpelier, *Norman Watts* of *Watts Law Firm,* Woodstock, and *Ethan Shaw* (On the Brief), Montpelier, for Defendants-Appellants.

¶ 1. **Dooley, J.** Plaintiff Richard Daniels is seeking foreclosure of a mortgage on two parcels of real property owned by defendant Elks Club of Hartford, Vermont (the Club). Defendant creditors, who include the Vermont Human Rights Commission (VHRC), four individual women, and the Watts Law Firm (Watts), all have junior security interests in the property at issue and oppose foreclosure. Creditors appeal from a trial court decision granting plaintiff's motions for summary judgment, concluding that plaintiff has standing to foreclose and is entitled to a .judgment of foreclosure against all parties, and dismissing creditors' counterclaims. For the reasons stated below, we reverse and remand the decision to include certain advances in the mortgage amount and the dismissal of the counterclaims.

¶ 2. Creditors' involvement here is rooted in their participation in an earlier civil rights action against the Club, which took place while the Club's corporate status was terminated and which resulted in attachments on the property in question and judgments for the civil rights plaintiffs and eventually for Watts. At the time of the attachment and the judgments, the property was already mortgaged to Mascoma Savings Bank (the Bank). On appeal, creditors make five main arguments: (1) the Club's reinstatement of a dissolved corporation nineteen years after its dissolution does not alter its liability under a final judgment entered against it as an unincorporated association, and plaintiff is personally liable for the judgment as a member of the Club; (2) the Bank was on actual notice of creditors' interest, and, therefore money advanced thereafter is not part of the mortgage amount that has priority over creditors' interests[1]; (3) plaintiff does not hold the mortgage or legal title and therefore cannot bring a foreclosure action; (4) issue preclusion does not bar creditors' claim that plaintiff, the Bank and the Club entered into an improper collusive relationship, designed to escape the attachment; and (5) title to the property merged because plaintiff, as a member of the unincorporated Club, held both legal and equitable title.

---

[1] This argument is not applicable to the Watts interest.

¶ 3. We reject the last three of these arguments but agree with the first, and reverse and remand the trial court's decision on the second for reconsideration under the correct legal standard. We conclude that reinstatement of the Club's corporate status did not result in limiting liability on the Club's debts arising from the discrimination lawsuit. Because the Club was a voluntary association at the time it discriminated against the individual women and at the time it retained Watts to defend it in the discrimination litigation, certain members of the Club are liable for the judgments to the extent they cannot be collected from the Club. Accordingly, we affirm the trial court's decision that plaintiff is entitled to foreclose, reverse and remand the foreclosure judgment, and reverse and remand its dismissal of creditors' counterclaims.

¶ 4. The undisputed material facts are as follows. Creditors' involvement in this case began with an action for intentional gender discrimination filed in 1998 against the Club by the first group of creditors here, the VHRC and four individual women who were denied membership in the Club due to their gender (collectively "discrimination creditors").[2] A jury found in favor of the plaintiffs in the discrimination case, resulting in a verdict that included: an injunction requiring the Club to admit the women, an award of $1 in compensatory damages and $5000 in punitive damages to each woman, and an award of $5000 in statutory penalties to the VHRC. This Court affirmed the verdict, monetary judgment, and permanent injunction on March 14, 2008. *Vt. Human Rights Comm'n v. Benevolent & Protective Order of Elks*, 2008 VT 34, 183 Vt. 606, 949 A.2d 1064 (mem.). On April 6, 2009, a separate final judgment was entered in favor of the discrimination creditors for approximately $446,000 in attorney's fees related to the discrimination case. Following these awards, the women and the VHRC modified an existing pretrial attachment on the Club's property, originally recorded in 2004, to secure payment of the jury verdict and attorney's fee award. The attachment was a junior lien — the Club having already mortgaged its property to the Bank in 1989.

---

[2] We include in the term "discrimination creditors" the four individual plaintiffs in the discrimination suit and the lawyers who represented them. Although the plaintiffs in the discrimination suit were awarded attorney's fees after they prevailed, the judgment for these fees was in the names of the lawyers. It itemized the amount due each lawyer.

¶ 5. Watts, the second creditor here, also holds a junior security interest in the Club's property. This firm represented the Club during part of the gender discrimination litigation and later obtained a $30,000 judgment against the Club for nonpayment of attorney's fees. That judgment is also secured by a judgment lien against the Club's property. The lien was filed in April 2008 and is junior to the interests of the Bank and the discrimination creditors.

¶ 6. The Club was first incorporated in 1940, but the Vermont Secretary of State revoked its corporate charter on June 23, 1989, for failure to file an annual report. The Club's corporate status remained terminated for almost nineteen years until its charter was reinstated on May 2, 2008. Plaintiff has been a member of the Club for more than forty years. He became a Club trustee for the first time in May 2008.

¶ 7. Just before its corporate charter was revoked in 1989, the Club borrowed $700,000 from the Bank, securing the loan with a mortgage deed on the Club's property. Years later, in July 2006, during the course of the discrimination lawsuit, the Bank advanced the Club an additional $25,000, purportedly secured by the original mortgage. In January and September 2007, the Bank also amended the terms of the promissory note to reduce the amount of the monthly payment from an amount covering repayment of both principal and interest to an amount representing interest only. The Bank was aware of the junior security interest held by the discrimination creditors when it made these deferrals and advanced the additional funds.

¶ 8. By June 2008, the Club had fallen behind on making payments on its mortgage to the Bank, and on June 19, 2008, the Bank assigned both its mortgage and promissory note to plaintiff. Although plaintiff is a longtime member of the Club, he completed this transaction in his individual capacity. The terms of the transaction required plaintiff to execute a promissory note to the Bank for approximately $493,000, deliver collateral assignment of the 1989 mortgage to the Bank, and post additional cash collateral.

¶ 9. In November 2008, plaintiff gave notice of a nonjudicial foreclosure of the mortgage. Creditors brought an action to enjoin the planned action. In December 2008, the Washington Superior Court denied creditors a preliminary injunction. The decision of the court did not end the controversy because it became clear in

the course of that litigation that plaintiff would have to bring a judicial foreclosure.

¶ 10. In January 2009, plaintiff filed in Windsor Superior Court a foreclosure complaint against the Club and all creditors with an interest in the Club's property subordinate to plaintiff's security interest. Plaintiff's complaint alleged that at all times since the Bank's assignment of the promissory note and mortgage the Club was in default as a result of its failure to promptly pay all installments of principal and interest and its failure to pay real estate taxes.

¶ 11. In the trial court, creditors raised a number of defenses to the foreclosure action and counterclaims. The court addressed creditors' defenses and counterclaims in its September 2009 decision granting plaintiff's motion for default judgment and for summary judgment.

¶ 12. Creditors made three general classes of arguments. First, they argued that plaintiff could not foreclose the mortgage for three reasons: (1) because of a collateral assignment to the Bank, he did not hold title; (2) because he was a member of the Club and responsible for its debts, he held both legal and equitable title to the property and those interests merged, eliminating the mortgage; and (3) plaintiff and the Club colluded to eliminate creditors' interests in the property and could not go forward in equity. The trial court rejected each of these arguments. It held that plaintiff transferred only a security interest to the Bank and retained title that allowed it to foreclose. It held that even if plaintiff held both the equitable title and the legal title in the property, merger would occur only if he intended it, and there was no evidence of such an intent. Finally, it held that creditors' collusion argument was barred by issue preclusion because the Washington Superior Court had ruled against it in creditors' injunction action. Alternatively, it held that creditors were not harmed by plaintiff's purchase of the mortgage from the Bank.

¶ 13. Creditors' second type of argument sought to reduce the amount that plaintiff could claim was secured by the mortgage or made part of that amount senior to the interests of the creditors. Under this category, creditors argued that part of the unpaid mortgage amount, the $25,000 advanced in 2006, represented an interest junior to that of the creditors because the Bank advanced that money to the Club after discrimination creditors' attachment interests were perfected and after the Bank became aware of

those interests. The court rejected this argument, holding that the creditors had to prove that they had provided written notice of their interest in the property to the Bank along with an objection to future advances. The court held there was no evidence of either written notice or an objection.

¶ 14. The third type of argument was reflected in the counterclaims. In essence, the argument was that plaintiff owed creditors an amount equal to creditors' judgments against the Club because plaintiff was a member of the Club and members of a voluntary association are responsible for the association's debts if the association cannot pay them. The trial court rejected this argument on the grounds that, even if the reinstatement did not eliminate individual liability, it would be at most the officers of the Club who would be liable.

¶ 15. Creditors raise the same issues on appeal, and we take them in the order set forth above. We review an award of summary judgment de novo and conduct a plenary, nondeferential review of questions of law presented by a summary judgment motion. *Lively v. Northfield Sav. Bank*, 2007 VT 110, ¶ 5, 182 Vt. 428, 940 A.2d 700. We will affirm a summary judgment decision when no genuine issues of material fact exist and the prevailing party is entitled to judgment as a matter of law. *Id.*; see also V.R.C.P. 56(a).

I.

¶ 16. We begin by considering the arguments raised by the creditors to defeat the foreclosure judgment. First, creditors claim that plaintiff cannot bring an action to foreclose because he assigned legal title and interest in the mortgage to the Bank in a collateral assignment. Creditors point to language that states, "Assignor [plaintiff Daniels] hereby sells, assigns and transfers to Secured Party [Mascoma Savings Bank] all of Assignor's rights, title and interest in and to the Mortgage, together with the notes, debts and claims thereby secured, as collateral security for the full and complete repayment and performance of the Note." The creditors contend that this shows that the Bank, and not plaintiff, is the holder of the mortgage. The trial court rejected this argument in part because "[t]hese provisions unambiguously establish that the parties meant to transfer a security interest in the mortgage rather than the mortgage itself." As a description of the parties' intent, we find this conclusion correct. The document

was entitled "Collateral Assignment of Mortgage" and clearly specifies that the transfer is made "as collateral security." It goes on to state, "So long as there shall exist no default in performance of Note, Assignor shall have the right to collect all payments arising under the Mortgage, use and enjoy the same."

¶ 17. This conclusion does not, however, resolve creditors' argument, which, as we understand it, is somewhat more esoteric. According to creditors, plaintiff lacks the right to foreclose by virtue of this collateral transfer, whatever was his intent. They argue that because Vermont is a title theory state, see *Huntington v. McCarty*, 174 Vt. 69, 71, 807 A.2d 950, 952-53 (2002), by transferring a security interest, plaintiff thereby transferred away legal title and with it the ability to foreclose, whether this was his intent or not. The question, then, is: What is transferred in a collateral transfer of a mortgage?

¶ 18. According to a natural understanding, which underlies creditors' argument, the collateral assignment of a mortgage is basically a mortgage of the initial mortgage. A clear articulation of this conception is offered in the Vermont Bar Association's Vermont Title Standards Index:

> A collateral assignment of a mortgage is, in essence, a mortgage of a mortgage. For example, if A has given a mortgage to B to secure A's debt, B may assign A's mortgage to C to secure B's indebtedness to C. If B satisfies its debt to C, then C should reassign A's mortgage back to B, who again may foreclose if A defaults. If C, rather than reassigning A's mortgage to B, purports to discharge B's assignment to C, this will be deemed to be a reassignment.

§ 18.2 cmt. 5 (2010), https://www.vtbar.org/UserFiles/files/For% 20Attorneys/titlestandards.pdf. On this understanding, the collateral assignment involves a transfer of the legal title to the real property. This view has the advantage of explaining how the collateral assignee is in a position to foreclose on the real property, which is essential to the collateral providing meaningful security. See *Torrey v. Deavitt*, 53 Vt. 331, 336 (1881) ("[I]t has been repeatedly held, and is well settled, that in equity an assignment of the mortgage debt carries with it as an incident the mortgage security. . . . It was long since decided that such an assignment of a mortgage is necessary to enable the assignee to

maintain an action at law upon the mortgage. Such an assignment must therefore convey to the assignee a legal interest in the mortgage premises."); cf. *Bank of Tokyo Trust Co. v. Urban Food Malls Ltd.*, 650 N.Y.S.2d 654, 661 (App. Div. 1996) ("New York law . . . permits a pledgee, in the case of a mortgage pledged as collateral to secure a debt, to institute an action to foreclose on the mortgaged property provided that the pledgor is joined as a party, either as a plaintiff or defendant.").

¶ 19. Creditors contend that if this conception is correct, then the Bank rather than plaintiff holds legal title to the property. As further evidence of this, they point to that fact that the collateral assignment specifically allowed for recording — and, in fact, was recorded — in the Hartford land records. As the holder of legal title, the creditors contend, the Bank held the right to foreclose and plaintiff did not.

¶ 20. We agree with much of the legal framework behind creditors' argument, but not with its conclusion. We agree that the collateral assignment must be treated akin to other mortgages. Thus, by assigning the mortgage to the Bank as collateral, plaintiff transferred legal title to the Bank and retained the equitable ownership, in particular the right to receive payments. As under a traditional mortgage, if plaintiff fulfilled his obligations on the debt, then the legal title would return to him, but until that time it remains with the mortgagee. In so concluding, we reject the idea that a mortgage can be properly transferred as collateral security without the transfer of legal title to the real property.

¶ 21. Creditors are incorrect, however, to infer from the fact that the Bank holds legal title that the Bank is the only party who may initiate a foreclosure action.[3] According to plaintiff, he "retained the beneficial ownership and control of the mortgage, including the right to foreclose." The view that a collateral pledgor is entitled to foreclose was established in *Wells & Dewing v. Wells & Scribner*:

> [T]he fact that the note and mortgage were held by the defendants as collateral, did not stand in the way of the

---

[3] In holding that plaintiff is permitted to bring an action to foreclose, we do not decide the question of whether the Bank would also be entitled to bring an action to foreclose on the property directly or whether the Bank would first have to foreclose upon plaintiff's interest.

orators proceeding, either by suit at law on the note, or by foreclosure on the mortgage, if they deemed it for their interest to have the note on the mortgage, or both, enforced earlier than the defendants saw fit to proceed in that behalf. The court would see to it that the rights and interests of the pledgee were protected in reference to the collateral, at the same time that the pledgor was acting in regard to his own existing reversionary interest in the pledge, by the proceeding to enforce it, as against the debtor in the pledge.

53 Vt. 1, 5 (1880) (citation omitted); see also 5 H. Tiffany & B. Jones, Tiffany Real Property § 1531 & n.84 (2011) (collecting cases); cf. *George v. Woodward*, 40 Vt. 672, 678-79 (1868) (holding that collateral assignor of mortgage note was entitled to transfer the note). To hold otherwise would raise the difficulty of whether the pledgee would owe a duty to the pledgor to foreclose, as the pledgor would be without independent recourse to protect the collateral. See *Duty of Pledgee to Foreclose on Request of Pledgor*, 32 Harv. L. Rev. 578 (1919).

■ ¶ 22. There is, however, a constraint: a party who has pledged a mortgage as collateral security cannot foreclose without allowing the pledgee to enter the suit. Cf. *S. Burlington Mech. & Elec. Contractors, Inc. v. Graybar Elec. Co.*, 138 Vt. 580, 581, 421 A.2d 1275, 1276 (1980). The Connecticut Supreme Court explains the principle clearly:

"When the owner of a mortgage has pledged it as collateral security for a debt of less amount than the mortgage, he still has such an interest in it as entitles him to bring an action for the foreclosure of it. . . . But in such an action the pledgee is a necessary party and may be made a co-plaintiff or a defendant. . . . It is proper for the mortgagee and the pledgee to join as co-plaintiffs, as they are, together, the owners of the entire bond and mortgage. Neither the mortgagor nor other parties to the action can object to such joinder of plaintiffs, as all the parties interested in the mortgage debt are thereby brought before the court so that its decree will be binding and conclusive upon them."

*Gordon v. Donovan*, 149 A. 397, 398 (Conn. 1930) (quoting 1 C. Wiltsie, A Treatise on the Law and Practice of Mortgage Foreclosure on Real Property §§ 304, 305 (1927)).

■ ¶ 23. In this case, the trial court correctly pointed out that this concern is not implicated because "Mascoma Savings Bank has already intervened in the action, and it is actively supporting Mr. Daniels' attempts to foreclose on the property." Accordingly, plaintiff is legally entitled to bring an action to foreclose, and we affirm the trial court's denial of the creditors' motion for summary judgment.

¶ 24. Second, creditors contend that plaintiff cannot foreclose because plaintiff's acquisition of the Club's mortgage resulted in a merger of legal and equitable title. They point out that when the interest of a mortgagee is assigned to the mortgagor, the interests normally merge. See 4 P. Powell, Powell on Real Property § 37.32 (M. Wolf ed. 2012). On this basis, they argue that the assignment of the Club's mortgage to plaintiff constituted a merger and that the mortgage was thus extinguished, leaving nothing upon which to foreclose. The trial court rejected this argument, noting that plaintiff acted in his personal capacity and that there was no intent to create a merger. Creditors respond that intent is not required for merger, relying on a statement from *Fletcher v. Ferry*: "We have not previously held that intent to merge is required, however, and we decline to do so now." 2007 VT 8, ¶ 7, 181 Vt. 294, 917 A.2d 937.

■ ¶ 25. There was no merger here, and the creditors' arguments to the contrary are entirely without merit. To begin with, merger requires identity between the holder of the equitable interest and the holder of legal title. See *Albright v. Fish*, 136 Vt. 387, 395, 394 A.2d 1117, 1121 (1978) ("The doctrine of merger operates when the same person becomes owner of both the benefited and the burdened land."). In this case, the Club is the holder of equitable title. When plaintiff acquired the mortgage from the Bank — leaving aside the collateral assignment — he acquired the legal title. Even if plaintiff shares interests and liabilities with the Club, he is only one member. Thus, there is not the requisite identity between holders to produce a merger. Moreover, there was no intent to effectuate a merger.

¶ 26. Creditors' invocation of *Fletcher* is misguided. That decision held that intent was not required to create a merger in the

equitable servitude context, explicitly contrasting that situation with the mortgage context where intent serves an important purpose. We explained that unintended operation of the doctrine of merger in the mortgage context could result in "unfairly elevat[ing] a junior [mortgagee] to senior status," which consideration of intent could avoid. *Fletcher*, 2007 VT 8, ¶ 7; see also 4 Powell on Real Property § 37.32[1] ("If there is any advantage to be gained by continuing the independent existence of the rights, such independent existence will be maintained."). In this case, merger would create exactly the result we warned against in *Fletcher*. In short, this case presents neither the factual nor the legal context for a merger.

■ ¶ 27. Finally, creditors argue that even if plaintiff has the legal right to foreclose, equitable considerations demand prevention of such foreclosure because the Bank's assignment of the mortgage to him constituted collusion to undermine creditors' interests. In making this argument, creditors contend that the trial court erred in its conclusion that the 2008 Washington Superior Court decision precludes them from arguing collusion between plaintiff and the Bank. We do not reach the question of whether the gender discrimination creditors are precluded, because it is clear that Watts is not so precluded. Watts was not a party in the Washington County litigation, and issue preclusion cannot be asserted against a party that was not involved in the earlier action. See *Alpine Haven Prop. Owners Ass'n v. Deptula*, 2003 VT 51, ¶ 14, 175 Vt. 559, 830 A.2d 78 (mem.) ("[T]he privity requirement relates to the party against whom issue preclusion is being asserted, not the party that is asserting issue preclusion."); *Trepanier v. Getting Organized, Inc.*, 155 Vt. 259, 265, 583 A.2d 583, 587 (1990) ("[P]reclusion should be found only when . . . asserted against one who was a party or in privity with a party in the earlier action . . . .").

■ ¶ 28. This lack of preclusion is immaterial, however, because we affirm the trial court's alternative basis for rejecting the requested injunctive relief. The trial court held that creditors were not entitled to relief because they were not harmed by the transactions. As the court put it: "The gender discrimination creditors have always been second in line to a senior 1989 mortgage. The gender discrimination creditors are still second in line to the same mortgage after the assignment. Nothing has

changed but the identity of the mortgagee." This conclusion mirrors the earlier decision of the Washington Superior Court in 2008: "Plaintiffs [i.e. creditors] have not been harmed by [Daniels'] actions. . . . If the bank had initiated . . . foreclosure, Plaintiffs would be in exactly the same position they are now. Nothing has changed but the name on the action." We agree. Whatever plaintiff's motive may have been in purchasing the mortgage from the Bank, creditors — who were then, and are now, the junior interest holders — have not been injured by plaintiff's actions. Creditors are not entitled to injunctive relief without articulating some harm to their interest. See *Vt. Div. of State Bldgs. v. Town of Castleton Bd. of Adjustment*, 138 Vt. 250, 256-57, 415 A.2d 188, 193 (1980) ("An injunction is an extraordinary remedy and will not be granted routinely unless the right to relief is clear. It may issue only in cases presenting some acknowledged and well-defined ground of equity jurisdiction, as when it is necessary to prevent irreparable injury or a multiplicity of suits." (citation omitted)).

## II.

¶ 29. We turn next to the argument seeking to reduce the amount that plaintiff could claim was secured by the mortgage. In this regard, the discrimination plaintiffs challenge the priority of the future advance made on the mortgage by the Bank. They argue that the advance by the Bank on the mortgage should not receive priority because the Bank was on actual notice of their attachment of the Club's property and would have known that they objected to increasing the mortgage to provide the Club with additional funds.[4]

¶ 30. Vermont has long had some version of what is known as the "optional/obligatory advance doctrine." Under this doctrine, future advances generally have priority over intervening attachments, unless the future advance is optional on the part of the mortgagee and the mortgagee has received notice of the intervening security interest. See *McDaniels v. Colvin*, 16 Vt. 300, 305 (1844). This priority of future advances is taken as reasonable "inasmuch as all such have notice by the record of the incumbrance, and of what it is intended to secure; and, furthermore, it

---

[4] This argument applies only to the gender discrimination plaintiffs and not to Watts, as the latter acquired a lien only after the advance had been made.

132

is in the power of such creditors, &c., by giving the requisite notice, to limit the amount of such further advances, so far as they are interested so to do." *Id.* The optional/obligatory advance doctrine has since been adopted by the Legislature in 27 V.S.A. § 410(b)(3)(B), which states in relevant part, "a future advance made under a recorded mortgage takes priority as of the date of the recording . . . if not made pursuant to commitment, to the extent of future advances that are outstanding before the mortgagee receives written notice of the intervening interest."

¶ 31. The trial court held that, under this rule, the Bank's future advance did not lose its priority because, regardless of what the Bank may have known or inferred, it had not received written notice and objection from the creditors.[5] It reached this conclusion despite creditors' request to conduct discovery before the court ruled because creditors relied exclusively on the knowledge attributable to the Bank[6] and did not allege that they had notified the Bank of their interest or objected to future advances. In reaching this conclusion, the trial court relied on language from early opinions. In *McDaniels*, this Court stated, "creditors, purchasers, or mortgagees, may prevent further advances, when they become interested, by *giving notice* to the first mortgagee of their interest, and an intimation, at least, that no further advances are to be made on the security of the mortgage as against them." 16 Vt. at 306. And we later explained that the notice "must contain enough to show that the junior interest objects to the making of the senior interest any larger." *Patch & Co. v. First Nat'l Bank*, 90 Vt. 4, 8, 96 A. 423, 424 (1916).

¶ 32. This old description of the rule differs, however, from that in 27 V.S.A. § 410(b)(3)(B) — enacted by the Legislature in

---

[5] There is some suggestion in the trial court's decision that the opposite conclusion would mean that the Bank "was engaging in an improper practice of advancing funds" or not "entitled . . . to make the advances." On the contrary, the opposite conclusion would show only that the Bank's advances did not have priority over the intervening interests.

[6] In addition to requesting time for discovery, creditors relied upon a deposition of the treasurer of the Club stating that he did not inform the Bank of creditors' attachment because an employee of the Bank told him that it already knew of the attachment. The treasurer could not, however, remember the time of this conversation. We infer that the court concluded that creditors had enough evidence of knowledge to survive summary judgment but that knowledge alone was insufficient to defeat the priority of the advance.

2000 — in two related ways. First, on its face, § 410(b)(3)(B) does not require that the intervening interest holder actually object to future advances. It is enough that the mortgagee "receives written notice of the intervening interest." Second, § 410(b)(3)(B) does not require that it be the intervening creditor that provides the notice; the statute is written in the passive voice, requiring that "the mortgagee receives written notice" without specifying by whom. Along these lines, creditors contend that the Bank had received actual notice of their intervening interest, and that therefore the advances are not entitled to priority. The question, then, is whether § 410(b)(3)(B) ought to be read to include the prior Vermont case law, or whether it ought to be read simply as it is written.

■■ ■■ ¶ 33. We conclude that § 410(b)(3)(B) is satisfied by any written notice and requires neither that the notice come from the junior creditor nor that the junior creditor specifically object to future advances. This is the natural meaning of the section as written, and we will generally give a statute its plain meaning. See *In re Jones*, 2009 VT 113, ¶ 7, 187 Vt. 1, 989 A.2d 482 ("Our first step . . . is to ascertain the plain meaning of the statute, as we presume that that is the most basic expression of legislative intent."). In this case, § 410(b)(3)(B) is written in passive voice and does not specify from whom the notice must come. Had the Legislature intended otherwise, it could easily have conveyed that. Cf. *In re Soon Kwon*, 2011 VT 26, ¶ 16, 189 Vt. 598, 19 A.3d 139 (mem.) (emphasizing that "[t]he landlord shall" language in 9 V.S.A. § 4461(d) meant that "[t]he method of delivery is explicit in the statute").

¶ 34. Moreover, when the Legislature enacted § 410(b)(3)(B), it repealed a provision that gave priority "unless the second mortgagee in writing notifies the first mortgagee of the incidence of his mortgage." 8 V.S.A. § 1207 (repealed effective 2001). Although this history is not determinative, we do consider this change significant. Compare *Diamond v. Vickrey*, 134 Vt. 585, 589, 367 A.2d 668, 671 (1976) ("It is well settled that, in interpreting amendatory language in a statute, we are guided by the rule that the Legislature intended to change the law."), with *Town of Cambridge v. Town of Underhill*, 124 Vt. 237, 240, 204 A.2d 155, 157 (1964) ("When changes in statutes come about only as a result of a revision, caution is required in determining whether or not any substantive change in the law was intended.").

■ ¶ 35. There is a further question of whether actual notice is sufficient or whether the statutory notice — here, written notice — is required even in the face of actual notice. In *Soon Kwon*, we recognized a general principle that the technical requirements of statutory notice will not be strictly enforced when the party seeking enforcement has received actual notice. 2011 VT 26, ¶ 14. The rationale for this principle is that, in general, having actual notice renders empty any complaint about failing to receive the statutorily prescribed notice. See *First Nat'l Bank v. Okla. Sav. & Loan Bd.*, 569 P.2d 993, 997 (Okla. 1977) ("[A]s a general rule, one having actual notice is not prejudiced by, and may not complain of failure to receive statutory notice."). We also recognized, however, that the application of this principle is "dependent on the statutory scheme and the content of the legislation." *Soon Kwon*, 2011 VT 26, ¶ 14. In the landlord-tenant context of *Soon Kwon*, we determined that there were good reasons to insist upon the statutory notice.

■ ¶ 36. We do not find such reasons here. The numerous and specific statutory requirements in *Soon Kwon* protected tenants against potential injuries. Here, the comparatively minimal statutory requirement — that the notice be written — appears to have the primary purpose of ensuring that mortgagees not be burdened with constantly monitoring for attachments before issuing advances, as they would be if record notice were sufficient to undermine priority.[7] Accepting actual notice in the place of written notice does not undermine this purpose because it does not impose any additional burden upon the mortgagee. A mortgagee need not seek out information about attachments to ensure that its priority is preserved, but where, as here, it has received such information, it cannot expect to retain its priority.

■ ¶ 37. In thus interpreting § 410(b)(3)(B) to be satisfied by actual notice, we agree with the Federal Bankruptcy Court's construction of the section, see *In re Blackmore*, No. 05-12045,

---

[7] To the extent that the creditors may have argued that it is enough that the Bank should have known of the attachment, we reject their argument. Although some states have held that constructive notice is sufficient, see, e.g., *People's Sav. Bank in Providence v. Champlin Lumber Co.*, 258 A.2d 82, 84 n.3 (R.I. 1969) ("[R]ecord notice of an intervening encumbrance is sufficient to interrupt the priority of a subsequent optional advance."), we do not join that view in light of the language of the statute.

2006 WL 1666194, at *2 (Bankr. D. Vt. Jan. 25, 2006) ("[F]uture advances made by a mortgagee will be subordinate if made after the mortgagee has actual notice of the intervening lien."), and we align ourselves with the way that most states have construed the notice contained in the optional/obligatory advance doctrine, see, e.g., *Mobley v. Brundidge Banking Co.*, 347 So. 2d 1347, 1349 (Ala. 1977) (holding that advances do not get priority if there is "credible evidence from disinterested witnesses to the effect that an officer of defendant bank had actual knowledge of the existence of a junior mortgage"); W. Allen, Annotation, *Optional Advance Under Mortgage as Subject to Lien Intervening Between Giving of the Mortgage and Making the Advance*, 138 A.L.R. 566 (1942) (collecting cases). If creditors can document that the Bank received notice of their intervening interest, we do not think that it is unfair to deny the Bank priority for the subsequent advance.[8]

¶ 38. For the above reason, the trial court used the wrong standard to determine whether the future advance was entitled to priority over creditors' interests. The sparse summary judgment record is inadequate to determine whether the Bank received actual notice of creditors' interests before it extended the advance. Accordingly, we must reverse and remand for such a determination. This holding reopens the decree of foreclosure because, depending upon the court's determination under the correct standard, it may reduce the amount that discrimination creditors would have to pay to redeem and the extent of the proceeds plaintiff will receive on sale of the property before discrimination creditors receive any proceeds.

---

[8] This result does not apply to the amount secured as a result of the deferrals. As the trial court correctly noted, deferrals in general do not materially prejudice junior creditors because they are preferable to the alternative, namely foreclosure. See Restatement (Third) of Prop.: Mortgages § 7.3 cmt. c (1997) ("Not all modifications will materially prejudice junior interests. For example, mortgagees commonly consent to an extension of the mortgage maturity date or to a rescheduling or 'stretching out' of installment payments. Absent an increase in the principal amount or the interest rate of the mortgage, such modifications normally do not jeopardize the mortgagee's priority as against intervening interests. Extensions of maturity generally reduce the likelihood of foreclosure of the senior mortgage and thus are beneficial, rather than prejudicial, to the interests of junior lienors."). Unless creditors can show some reason why they were materially prejudiced by the deferrals — which seems unlikely given that creditors' aim in this suit is to enjoin foreclosure — the deferrals do not alter the priority of the Bank's mortgage.

## III.

¶ 39. We reach the third category of claims, which contains the largest issue in the case — whether plaintiff as a member of the Club is liable to creditors for the amount of their judgments. Creditors argue that because the judgments are against the Club as an unincorporated association they can collect the judgments from all or any members of the Club, including plaintiff. They base this argument on several claims: the Club held itself out as an unincorporated association throughout the discrimination litigation; the first judgment in the discrimination case was entered against the Club before reinstatement of its corporate charter; and all judgments were entered based on liability the Club incurred as an unincorporated association.

¶ 40. Plaintiff maintains that, under 11B V.S.A. § 14.22(c), reinstatement of the Club's corporate charter on May 2, 2008, relates back to the date of termination in 1989 as if termination had never occurred. Under § 14.22, plaintiff argues, the Club became liable for the judgments as a corporation and creditors cannot collect from members of the Club even if they were directly involved in the acts for which the Club is liable. He particularly argues that creditors cannot collect from him because he had no position of authority in the Club when the discrimination occurred or when Watts was hired.

¶ 41. The question of whether plaintiff can be held liable for the judgment against the Club, therefore, involves two separate questions. First, if there were no corporate status, could creditors seek to collect on the judgment against the Club from plaintiff as a member without a further showing that plaintiff actively participated in the conduct of the Club that led to the judgment? Second, does reinstatement of the corporate status retroactively restore the shield on personal liability? We address these issues in turn.

## A.

¶ 42. Before we turn to the effect of the reinstatement of the corporate status, we consider the nature of the Club and the liability of its members, trustees, and officers during the period before the corporate reinstatement. During that period, the Club was an unincorporated voluntary association. Black's Law Dictionary explains that a voluntary association is "[a]n unincorporated

organization that is not a legal entity separate from the persons who compose it." Black's Law Dictionary 132 (8th ed. 2004); see also *Coolidge v. Taylor*, 85 Vt. 39, 53, 80 A. 1038, 1045 (1911) (contrasting a corporation and a voluntary association); *E. Corey & Co. v. Morrill*, 61 Vt. 598, 603, 17 A. 840, 841 (1889) (referring to "a corporation by voluntary association"). In short, a voluntary association is an organization that lacks legal status as a corporation — precisely what the Club became when it was stripped of its corporate status.

¶ 43. Two statutes govern suits against an unincorporated association. The first, 12 V.S.A. § 814, establishes the procedure for a suit against an association:

> A partnership or an unincorporated association or joint stock company may sue and be sued in its firm, associate or company name and service of process against such partnership, association or company made upon any officer, a managing or general agent, a superintendent, any member thereof or any agent authorized by appointment or by law to receive service of process, shall have the same force and effect as regards the joint rights, property and effects of the partnership, association or company as if served upon all the partners, associates or shareholders.

More importantly for the present purposes, the liability of members for a resulting judgment against an unincorporated association is governed by 12 V.S.A. § 5060, which provides:

> When execution on a judgment obtained against a partnership, association or company in its firm, associate or company name is returned unsatisfied in whole or in part, an action of contract for the amount unpaid may be brought against any or all of the partners, associates or shareholders upon their original liability, provided that only one such action shall be brought and maintained at the same time. If the execution issued in the last named action is returned unsatisfied in whole or in part, subsequent actions may in like manner be maintained for the amount unpaid.

In other words, where a judgment against an association is unsatisfied, the creditor may pursue an action against any or all

of the associates for the unfulfilled amount. Both statutes have been part of Vermont law, without change, for over a hundred years.

¶ 44. During that time, we have, on three separate occasions, applied these laws to members of unincorporated associations. We first addressed the extent of liability of persons associated with an unincorporated voluntary association in *F.R. Patch Manufacturing Co. v. Capeless*, 79 Vt. 1, 63 A. 938 (1906). *Capeless* explains that "an unincorporated association, as regards its rights and liabilities, is fundamentally a large partnership." *Id.* at 6, 63 A. at 939. In equity, and under Vermont statute,[9] partnership debts must be paid first out of partnership property and then against the estates of partners:

> [P]artners, associates, and shareholders are made individually liable to execution creditors for the amount of a judgment unpaid after an execution against the joint property has been returned unsatisfied in whole or in part, with the further limitation that only one suit against members shall be brought and maintained at the same time, and if the execution in the last suit is not returned fully satisfied subsequent actions can be had in like manner for so much as remains unpaid. Here the liability of the individual members in its modified form is contractual in nature by operation of the statute. In legal effect each member when he becomes such thereby obligates himself to the other members and to all persons who may hold liabilities against the firm, association, or company of which he becomes a member, for the payment of the amount unpaid on judgments against it after the joint property has been taken in execution and applied thereon, and this obligation is in law as much a part of every contract and liability against the partnership, association, or company as it would be if it had

---

[9] Under partnership law, individual partners may be liable for judgments against the partnership, and our judgment with regard to the unincorporated Club largely parallels partnership law. According to 11 V.S.A. § 3226(a), "[e]xcept as otherwise provided in subsections (b) and (c) of this section, all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law." The exceptions refer to partners who had not yet joined at the time the obligation was incurred and to partners in limited liability partnerships.

been directly entered into by the members in connection therewith.

*Id.* at 8, 63 A. at 939. We applied this same understanding to unincorporated associations on two subsequent occasions. See *Johnson v. Paine*, 84 Vt. 84, 86, 78 A. 732, 733 (1911) ("The judgment against the society is conclusive, as to all matters involved in the suit, upon all persons who were members of the association when the liability merged in the judgment was created. Hence liability of the defendant in the action before us depends upon whether he was such a member."); *Tarbell & Whitham v. Gifford*, 82 Vt. 222, 227, 72 A. 921, 923 (1909) (*Gifford II*) (same). All three of these cases involved nonprofit societies or unions. See *Johnson*, 84 Vt. at 86, 78 A. at 733 (Union Agricultural Society); *Gifford II*, 82 Vt. at 223, 72 A. at 921 (also Union Agricultural Society); *Capeless*, 79 Vt. at 9, 63 A. at 940 (Protection Lodge, No. 215, International Association of Machinists).

¶ 45. The liability created by § 5060 is not individual liability for those acts that were the basis for the initial judgment but rather a secondary contractual liability for the voluntary association's debt arising out of the judgment.[10] The theory of the statute is that by becoming members of an unincorporated association, individuals agree to be liable in a collection action on a judgment if that judgment cannot be fully met by the association's assets. The judgment against the association is conclusive "in respect to all matters involved in the suit upon all persons who were members" when the liability arose. *Capeless*, 79 Vt. at 9, 63 A. at 940. That is, insofar as a judgment has entered, the issue of liability is not to be relitigated; the question is simply of collection. What the statutory scheme accomplishes is positing an implied contractual agreement among members to be accountable for any deficiency of the association. As *Capeless* makes clear, this liability on judgments depends on a statutorily created action in

---

[10] Discrimination creditors sued only the Club, and not any of its officers, trustees, or other members. Section 4502(a) of Title 9 prohibits "[a]n owner or operator of a place of public accommodation or an agent or employee of such owner or operator" from denying the privileges of the place of public accommodation to any person because of sex. The section that authorizes private suits for "injunctive relief and compensatory and punitive damages" does not specify who the aggrieved person can sue. *Id.* § 4506(a). Because discrimination creditors sued only the Club and assert derivative liability against the members, we do not consider whether they could additionally have sued officers, trustees, or others.

contract that is "supplementary" to the underlying judgment. *Id.* at 6-9, 63 A. at 938-40. Suits against associations, as established by 12 V.S.A. § 814, are capable of binding the members to a judgment against the association, in compliance with due process, because "they impliedly contracted with reference to those provisions of the statute and are bound by them." *Id.* at 11, 63 A. at 940. The members are then jointly and severally liable and may be sued individually or together. *Tarbell & Whitham v. Gifford*, 79 Vt. 369, 371, 65 A. 80, 80-81 (1906) (*Gifford I*) ("And in analogy to the right at common law to attach the separate property of each member, we think the term 'any,' as there used in the phrase 'any or all,' should not be given its limited sense, but its enlarged and plural sense, meaning some, however few or many; an indefinite number. Under this construction, such a supplemental suit may be brought against one, or more, or all of the partners, associates, or shareholders."). This is true regardless of the type of judgment involved — whether an ordinary contractual liability or a liability for an intentional wrongful act.[11] On the basis of this well-established Vermont law, we hold that, assuming there is no restoration of the corporate liability shield, creditors may seek to collect from individuals who were members when the various liabilities arose if they are unable to collect from the Club itself.

¶ 46. The dissent would prefer to hold individuals liable only "if they personally participated in the decision to deny membership to the plaintiffs because of their gender, or otherwise ratified that decision." *Post*, ¶ 110.

---

[11] Of the three cases that have applied § 5060, *Capeless* is the most relevant to this question. In that case, a judgment had entered against Protection Lodge, No. 215, and the plaintiffs sought to collect from individual members of the Lodge. As the court reporter's description in the Vermont Reports indicates, the defendant appealed precisely for the purposes of arguing that "the cause of action is not founded on a contract express or implied, but on a tort." 79 Vt. at 2. The nature of underlying liability was described in *F.R. Patch Manufacturing Co. v. Protection Lodge No. 215, International Ass'n of Machinists*, 77 Vt. 294, 294, 60 A. 74, 75 (1905). As that decision describes, the Lodge's liability arose from conspiring with various other labor unions to harass and intimidate workers. The *Capeless* decision held that collection on this judgment was available from individual Lodge members.

In the other two cases, *Johnson v. Paine* and *Gifford II*, the underlying judgment was based on a contract with an attorney to defend the association against a tort action. The facts of these cases are similar to those underlying the claims of the Watts Law Firm in this case.

¶ 47. The dissent would reach this result by drawing a distinction between nonprofit and for-profit associations, citing various cases from other jurisdictions that have drawn this distinction as a matter of common law. The idea is that, with regard to nonprofit groups, "mere membership" without some sort of "active participation" in the wrongful act should not result in liability.

■■ ¶ 48. In response to the dissent, we emphasize first that while the Court in *Capeless* may have analogized to common law liability of partners or stockholders, its decision is based squarely on the plain meaning of the statute, now 12 V.S.A. § 5060. The decision summarizes that the remedy "is statutory, [and] consequently . . . the actions must be based upon the statute." 79 Vt. at 9, 63 A. at 940. The statute treats "partners, associates or shareholders" alike, imposing liability on them when execution against their partnership, association, or company is unfulfilled. 12 V.S.A. § 5060. By decision, we have applied the statute to unincorporated associations. Even if the common law evolved in other jurisdictions, as the dissent argues, we do not understand how that change could modify the language of the statute.[12] We are bound by stare decisis to follow our precedents. *Estate of Girard v. Laird*, 159 Vt. 508, 515, 621 A.2d 1265, 1269 (1993) ("We do not lightly overrule settled law especially where it involves construction of a statute which the legislature could change at any time."). If our construction was erroneous, it is up to the Legislature to modify the statute to produce a different result. See *Cyr v. McDermott's, Inc.*, 2010 VT 19, ¶ 34, 187 Vt. 392, 996 A.2d 709 (Reiber, C.J., dissenting) ("[I]t is up to the Legislature to enact a statute that properly balances the relevant policy considerations."); *State v. Racine*, 133 Vt. 111, 114, 329 A.2d 651, 653 (1974) ("If the provisions of a statute are unfair or unjust, the remedy is by a change of the law itself, to be effected by the legislature, and not by judicial action in the guise of interpretation.") (quotation omitted).

■ ¶ 49. Even if we were starting anew in interpreting § 5060, we are at a loss to see how we could import notions of personal

---

[12] Vermont appears to be somewhat unique in resolving this issue by statute and not by common law. See Annotation, *Personal Liability of Member of Voluntary Association Not Organized for Personal Profit on Contract with Third Person*, 7 A.L.R. 222 (1920) (listing Vermont as the only state that, by statute, treats members of a nonprofit association as partners).

culpability into its language. As this Court pointed out in *Gifford I*, the statute specifically authorizes suit to be brought against "any or all" of the associates. 79 Vt. at 371, 65 A. at 80-81. The language is wholly inconsistent with an interpretation that would allow the trial court to impose liability on some of the members but not others.

¶ 50. Furthermore, even if it were within our powers to rewrite the laws of this state out of concern for unfairness to uninvolved members, there are several reasons why the unfairness in this case is less than it might initially appear. First, the dissent's position would create an arguably greater unfairness in the opposite direction. To require creditors to prove active participation — for example, having voted against the admission of the women — is almost certain to erect a hurdle that could never be cleared.[13] The membership votes were conducted by secret ballot; exposing the individual votes would have been virtually impossible at the time and would be even more difficult now, over a decade later.

¶ 51. Second, the overwhelming majority of the damages in this case arise not from the discrimination itself, but from the expense of fighting this case vigorously for years. Each member had the right to discontinue membership, not only before the discriminatory votes occurred, but afterwards, before many of the litigation costs accumulated. Insofar as the choice is between leaving creditors — including the Club's own attorney — empty-handed after all these years and forcing those members who retained their membership throughout the protracted litigation to bear the burden, we see less unfairness in the latter approach.[14]

¶ 52. Third, even if participation theoretically could be proved, it would force creditors, who have already litigated their case and achieved a judgment, to prove the elements of discrimination a

---

[13] In fact, it is possible that there might be no individual member who voted against each woman. The discrimination occurred through a majority of members always voting to exclude, and there is no reason that it had to be the same majority. What this theoretical point highlights is that discrimination is often a collective action and necessarily involves holding a group, not individuals, accountable.

[14] Were we in the business of fashioning legal rules entirely out of thin air on the basis of our sense of fairness, some sort of burden-shifting might seem most fair: if a member could prove his lack of involvement, then he could avoid sharing in the judgment. This sort of rule crafting, however, is squarely for the Legislature.

second time, as though the first suit were an entirely empty exercise. See *Martin v. Curran*, 101 N.E.2d 683, 686 (N.Y. 1951) (lamenting injustice in statutory scheme whereby, after obtaining a judgment, plaintiff "would have to plead and prove, all over again, the members' own liability"). In this case, a judgment against the Club already exists and its validity is not before us. The original case was the appropriate forum for the questions of original liability to be addressed. In the underlying case, for example, the Club might have argued that it, as an unincorporated group of individuals, could not be held in violation of the law without proof of each member's involvement. Cf., e.g., *id.* at 685-86 (noting that, under New York law, in order to achieve a judgment against an unincorporated association, one must assert a claim that is valid against each member).

¶ 53. Fourth, although it may seem unfair to hold account-able a member who did not participate in wrongdoing, it is crucial to recognize that the liability imposed by § 5060 is not liability for the original wrongdoing, but liability for the debt. The statutory scheme charges individuals who join unincorporated associations with knowledge that they are agreeing to a certain form of contractual liability for collective debts. If a member of the association was simply ignorant of this law, such ignorance is not an excuse. If, on the other hand, a member was ignorant of the fact that the Club was such an organization, then our decision below concerning reinstatement affords that individual relief.

¶ 54. Finally, the collection from individual members is only authorized when collection from association assets is impossible. The Club's members could avoid any joint-and-several liability if the Club were to raise funds to cover its own debts.

¶ 55. In stressing that we must apply the law as we find it, and the reality that fairness must in this case be viewed from the perspective of each of the parties, we acknowledge that the possibility of visiting liability on a mostly inactive Club member, who may have supported admission of women and opposed the Club's decision to fight the discrimination litigation, with its very high cost, seems an inappropriate result. Nonetheless, the Legis-lature is in the position to modify the law to better accommodate the interests involved. See *Martin*, 101 N.E.2d at 686 ("Whatever reasons be pressed on us for such changes, the power to change is not ours. It is for the Legislature to decide whether or not to

overhaul these settled rules, after hearing both sides, and after considering the interests of the general public as well as those of the innumerable members of these associations."). We urge it to look again at the governing statutes. In this case, whether the statutory policy judgments are fair or not, we conclude that, absent the corporate shield on liability, § 5060 permits the creditors to collect from individuals who were members when the various aspects of the judgment against the Club arose if collection from the Club itself is not possible.

## B.

¶ 56. Insofar as creditors could seek to collect from individual members of the Club while it was an unincorporated association, the second question is whether reinstatement of the Club's corporate status operates to shield the members retroactively. We disagree with plaintiff's contention that reinstatement of the Club's corporate status categorically reinstates the corporate liability shield with regard to creditors' judgments, which resulted from liability incurred after termination of its corporate status and before reinstatement. As more fully explained below, we believe that whether there is a liability shield should depend on the expectations of the parties. In this case, if creditors cannot collect from the Club, they can collect from individuals who were members at the time the debts arose and who were aware, or should have been aware, of the Club's status as an unincorporated association.

¶ 57. In Vermont, as in many jurisdictions, the state may dissolve a corporation involuntarily without judicial proceedings for failure to file a timely biennial report. 11B V.S.A. § 14.20(2)[15]; see also 16A W. Fletcher, Cyclopedia of the Law of Corporations

---

[15] The decision of the trial court applied 11A V.S.A. § 14.20(a) and its predecessors, although this statute applies to business corporations, whereas the appropriate statute is that governing nonprofit corporations. See 11B V.S.A. §§ 14.21, 14.22. The record indicates that the Secretary of State considers the Club as a "service club," which we would infer is a form of nonprofit corporation. Further, the record contains a number of IRS Form 990s, which are filed annually by nonprofit corporations under § 501(c) of the Internal Revenue Code. Although the statutes applicable to business corporations and those applicable to nonprofit corporations have some language differences, the substance of the current statutes is essentially the same. Further, as discussed in note 17, the transitional provision applies generally to corporations. Thus, it is not relevant to our decision whether the Club is considered to be a business or nonprofit corporation.

§ 8112.10, at 193 (rev. vol. 2003). The statute in effect in 1989, former § 2607 of Title 11, provided the following:

> A corporation which fails to file a status report required by section 2701 of this title within 3 months of the date therein required, and after notice by the secretary of state to the registered office of the corporation shall cease to exist and the secretary of state shall notify such corporation of such termination. If, however, such terminated corporation shall file such status report within three months of its termination date together with a fee of $25.00, its charter shall be reinstated by the secretary of state. Such charter may be reinstated by the superior court of the county where such corporation has its registered office, upon petition filed within one year of the date required by section 2701 of this title and upon condition that it file the status report required together with the fee of $50.00.

11 V.S.A. § 2607(a) (repealed 1997)[16]; see also *F.W. Webb Co. v. Martell*, 149 Vt. 254, 255, 542 A.2d 286, 287 (1988) (holding that business corporation that failed to properly file annual report was terminated under § 2063 of Title 11 effective upon sending of notice of termination by office of Secretary of State).

¶ 58. A corporation may, however, reverse this involuntary termination by filing the requisite report together with any required fees, and the Secretary of State will reinstate its charter. 11B V.S.A. § 14.22(a). The current statute, effective on January 1, 1997, states that such reinstatement "relates back to and takes effect as of the effective date of the administrative dissolution and the corporation shall resume carrying on its activities as if the administrative dissolution had never occurred." *Id.* § 14.22(c). In a transition provision effective June 21, 1994, the Legislature applied this language to corporations terminated prior to March 27, 1990

---

[16] The statute was amended in 1990 to allow the corporation at any time to file the status report with $25 for each year that it was delinquent. The amendment added as a third sentence to § 2607(a), replacing the third sentence above, "Reinstatement shall revive and validate all actions taken by a corporation during its termination period, if such actions would otherwise have been legally binding on the corporation if it had never been terminated." 1989, No. 129 (Adj. Sess.), § 2, eff. March 27, 1990.

for failure to file a report. 1993, No. 235 (Adj. Sess.), § 10d.[17] By its terms, the transition provision is applicable to the Club.

¶ 59. Whether § 14.22(c) should be interpreted to allow members of a reinstated corporation to escape personal liability for actions taken during the period when the corporation was terminated presents an issue of first impression.[18] Contrary to the argument of plaintiff and the dissent, we cannot conclude that the statute explicitly answers this question. The transition provision states that the corporation "shall resume carrying on its activities" as it had prior to the dissolution. In other words, the transition provision restores the powers of the corporation to conduct business as if the termination never occurred. It does not address the liability limitation of the persons who govern or are members of the Club. See *Marshall v. Baggett*, 616 F.3d 849, 854 (8th Cir. 2010) (considering Nebraska statute).[19]

---

[17] This transitional statute applies to both business and nonprofit corporations.

[18] We assume for purposes of this discussion that, if the Club had never had its corporate status terminated, the members, officers, and directors would be immune from liability. We note, however, that 12 V.S.A. § 5060 states if execution on a judgment is returned unsatisfied against an association or company, it may be collected against "any or all of the partners, associates or shareholders." There is no indication in this language that the corporate form gives immunity to shareholders or to associates. We leave the question of the meaning of the statute in the corporation context to another day.

[19] We are also not moved by § 14.21(c), which states, "A corporation involuntarily dissolved continues its corporate existence but may not carry on any activities except those necessary to wind up and liquidate its affairs . . . ." 11B V.S.A. § 14.21(c). This section accords with the common-law understanding that corporate existence is not utterly extinguished upon involuntary dissolution. But the continued existence is limited to discrete activities related to winding down and liquidating assets. See, e.g., *Weatherly v. Capital City Water Co.*, 22 So. 140, 143-44 (Ala. 1897) ("Upon dissolution, the corporation is essentially dead, except for the general purpose of collecting its assets, paying its debts, and dividing its property and money remaining after the satisfaction of its liabilities among its stockholders. For the purposes of the enterprises or business which it was chartered to carry on, it is as essentially dead as if we had no statute continuing its life for the other specified purposes, — as if, indeed, it had never existed at all . . . ."). As this suggests, for all other purposes, the corporate charter is dissolved, and with it the shield on liability. See, e.g., *Express Recovery Servs., Inc. v. Rice*, 2005 UT App 495, ¶ 5, 125 P.3d 108 (construing statutory language stating that dissolved corporation "continues its corporate existence" to mean that a limited existence continues, which is compatible with the fact that "the corporation's officers may not be shielded from liability for some business conducted after an administrative dissolution"); *Murphy v. Crosland*, 886 P.2d 74, 78 (Utah Ct. App. 1994) ("[T]he

¶ 60. Jurisdictions are divided on the effect of reinstatement pursuant to statutes similar to 11B V.S.A. § 14.22(c) on the personal liability of persons involved in the governance of, or members or stockholders in, terminated corporations. In many jurisdictions, the reinstatement statute explicitly resolves the issue. See, e.g., *Moore v. Occupational Safety & Health Rev. Comm'n*, 591 F.2d 991, 994-96 (4th Cir. 1979) (under Virginia law, directors are liable for OSHA penalty for conduct during period when corporation was dissolved for failure to file annual report and pay franchise tax; liability remains despite reinstatement of corporation because statute states that reinstatement "shall have no effect on any question of personal liability of the directors"); *Frederic G. Krapf & Son, Inc. v. Gorson*, 243 A.2d 713, 715 (Del. 1968) (under Delaware law, president of corporation is not liable for conduct during charter forfeiture because corporation was reinstated and statute provides that debts become "the exclusive liability of the corporation"). Where the reinstatement statute does not explicitly address personal liability, the majority rule appears to be that those who act for the corporation after its termination, but before reinstatement, are personally liable for actions occurring during that period. See *Moore*, 591 F.2d at 994-95. But see 16A W. Fletcher, *supra*, § 8117, at 228 ("In most jurisdictions, the reinstatement of a corporation following dissolution by administrative action of the state relates back to the effective date of dissolution, and directors or officers are not personally liable for actions undertaken during the period of dissolution or suspension."[20]).

¶ 61. After reviewing the precedents from other jurisdictions, we conclude that it is unwise to adopt one hard-and-fast personal liability rule for reinstated corporations. We think that whether reinstatement operates to shield personal liability must depend on the reasonable expectations of the parties at the time

---

majority rule, which accords with the rule at common law, is that by continuation of the business without contemplation of liquidation, the directors and officers are held personally responsible for contract and tort liability incurred during the period following dissolution. Additionally, the shareholders may also 'become liable as partners where they agree to continue the business after dissolution, or participate in such continued business.'" (citations omitted)).

[20] This statement, relied upon by the dissent, is somewhat perplexing in that the treatise's compilation of cases actually places a greater number of jurisdictions on the opposite side. What is clear is that courts have ruled both ways on this issue.

the liability arises. These expectations will be shaped by the context in which the liability arises, especially the nature of the obligation, the parties' knowledge, and the timing of the corporate termination and the liability.

¶ 62. This apparently sounds complex to the dissent, but the idea is quite simple. Where a creditor has dealt with a corporation as a corporation — ignorant or indifferent to the administrative dissolution — then the liability shield should apply. As the dissent points out, "there is nothing inherently 'inequitable [in] requir[ing] corporate creditors that have dealt with individuals as agents of the corporation to seek relief solely from the corporation.'" *Post*, ¶ 103 (quoting Note, *Dissolution and Suspension as Remedies for Corporate Franchise Tax Deliquency: A Comparative Analysis*, 41 N.Y.U. L. Rev. 602, 607 (1966)). Where, on the other hand, a creditor has knowingly dealt with a dissolved corporation as an unincorporated association, then retroactive restoration of the liability shield will circumvent the legitimate expectations of the creditors. It is inequitable to permit an entity to hold itself out as an unincorporated association and then retroactively chameleon into a corporation. Thus, we believe that reinstatement of the liability shield should depend on the expectations of the parties. See *Barker-Chadsey Co. v. W.C. Fuller Co.*, 448 N.E.2d 1283, 1287 (Mass. App. Ct. 1983) (holding that reinstatement of corporate shield should depend on "the mutual understanding of the parties").

¶ 63. This point is demonstrated by the conflicting decisions from New York. An oft-cited early decision from a New York lower court is *Poritzky v. Wachtel*, 27 N.Y.S.2d 316 (Sup. Ct. 1941). In *Poritzky*, the defendant, president of a corporation, opened an account with a butcher on behalf of the corporation. The corporation was later dissolved by proclamation of the secretary of state for failure to pay its franchise taxes, but the defendant continued to order products from the butcher. The defendant subsequently paid the overdue franchise taxes and reinstated the corporation, but not before the butcher brought an action against him individually for payment. New York's law at the time stated that reinstatement shall "have the effect of annulling all of the proceedings theretofore taken for the dissolution of such corporation . . . and it shall thereupon have such corporate powers, rights, duties and obligations as it had on the date of the publication of the [dissolution] proclamation, with the same force

and effect as if such proclamation had not been made or published." *Id.* at 317. Similar to plaintiff's argument here, the defendant argued that this statute provided that the reinstatement operated retroactively to restore the corporation during the entire time that the obligation to the butcher arose, thereby validating the acts of the defendant as president and absolving him from personal liability. *Id.* The court disagreed. It held that to interpret the statute in accord with the defendant's argument "would encourage fraud and abuse" because "a former officer of a dissolved corporation could obtain credit and then upon subsequent discovery of the non-existence of the corporation, by merely paying arrears in franchise taxes, could shift the personal liability which the law would otherwise impose upon him back to the corporation." *Id.* at 318.

¶ 64. The lower courts in New York followed *Poritzky*, until another Supreme Court justice rejected it in *Department 56, Inc. v. Bloom*, 720 N.Y.S.2d 920 (Sup. Ct. 2001). The *Bloom* court held:

> Seductive though it may be, the *Poritzky* rationale is fallacious, and I respectfully choose not to follow it. Neither *Poritzky* nor the cases adopting its holding explain why such fraud and abuse would be encouraged. In general terms, the *Poritzky* rationale may be stated as follows: the existence of adverse consequences discourages wrongful conduct; therefore, the absence of adverse consequences encourages wrongful conduct. People, however, are motivated by the expectation of benefits, not by the absence of adverse consequences. In the field of logic, the *Poritzky* rationale commits the formal fallacy of denying the antecedent. I can conjure up no scenario that would entice a corporate officer to purposefully allow his corporation to be dissolved and I fail to see how, even if he did, there would be any fraud perpetrated on a creditor or any benefit inuring to such corporate officer. Put another way, absent any dissolution a creditor would be dealing with a corporation and relying on the soundness of the corporation's credit and ability to pay. With a period of dissolution later annulled, a creditor would believe it was dealing with a corporation and relying on the soundness of the corporation's credit and ability to pay. In both cases the consequences to the debtor, the corporation and the creditor are identical.

*Id.* at 922-23.

¶ 65. After *Bloom*, another New York Supreme Court opinion analyzed the New York precedents, including *Poritzky* and *Bloom*, and concluded that a more conditional rule applied. See *Lodato v. Greyhawk N. Am., L.L.C.*, 807 N.Y.S.2d 818 (Sup. Ct. 2005). The court held:

> Based upon all of the foregoing, the court finds that individual officers or directors of corporations should be shielded from personal liability absent a showing of fraud or misrepresentation and that an officer or director of a corporation that has forfeited its corporate charter for non-payment of taxes and been dissolved by proclamation of the Secretary of State pursuant to the Tax Law is not personally liable for service obligations of the corporation contractually undertaken while the corporation was dissolved, where the officer acted without knowledge of the corporation's dissolution, the dissolution was truly inadvertent and not due to neglect, the corporation quickly rectified the default by seeking reinstatement and there is a subsequent annulment of the dissolution and reinstatement of the corporation.

*Id.* at 824.

¶ 66. Finally, we note the later decision in *Nigro v. Dwyer*, 438 F. Supp. 2d 229 (S.D.N.Y. 2006), which attempted to reconcile the various New York decisions, including federal decisions not considered in *Lodato*. The controversy in *Nigro* dealt with unpaid pension contributions under a union contract assented to on behalf of a terminated corporation by the defendant, the corporation's president. The defendant appears to have been the only employee of the corporation and sought to avoid personal liability because of the reinstatement of the corporation, approximately seven years after it had been terminated and six days before the complaint was filed. The court rejected the reasoning of *Bloom*, "especially considering the record before me, which strongly suggests a deliberate effort to evade the payment of contributions by a person who was afforded the protections and benefits of the Union contract during [the corporation's] period of dissolution." *Id.* at 235. It was bound, however, by federal decisions that appeared to accept the reasoning of *Bloom* except in cases of fraud or bad faith. *Id.* at 237. Drawing partly on *Lodato*, the court itemized

factors that would bear on fraud or bad faith and ordered an evidentiary hearing on the factors. The court decided that "[a] variety of factual issues need to be tried concerning the circumstances of the dissolution and reinstatement and [defendant's] behavior during the interim period — including, specifically, his conduct at or about the time the contract was signed and his knowledge of the corporation's status at that time." *Id.*

¶ 67. Looking at the factual circumstances and expectations of the parties in this case, we do not believe that the restoration of the corporate status should reinstate the limitation on personal liability. A number of factors are relevant to our decision. The lack of corporate status was hardly fleeting: the corporation was terminated in 1989 and obtained reinstatement nineteen years later, in May 2008. The events giving rise to the liability occurred entirely within this time period. The underlying litigation was commenced in 1998 and involved conduct that occurred during 1996 and 1997, well after the termination of the corporation. See *Human Rights Comm'n v. Benevolent & Protective Order of Elks, Lodge No. 1541*, 2003 VT 104, ¶¶ 7-8, 176 Vt. 125, 839 A.2d 576. There is no indication in the record that creditors ever knew that the Club was once a corporation. Plaintiffs sued the Club as a voluntary association, and the Club represented itself as a voluntary association throughout the course of the litigation. At one point, the attorney for the Club at the time explicitly stated, "this is not a corporate entity, and any damages that might be suffered are going to be shouldered by each one of these individuals."[21] The reinstatement occurred only after the litigation had run its course — once it became time to collect — about a month and a half after this Court affirmed the trial court judgment against the Club. See *Human Rights Comm'n*, 2008 VT 34.

¶ 68. The judgments in this case contain various elements, and the nature of those elements is very relevant to the resolution of the issue before us. The bulk of the amount is for attorney's fees. Of this, $30,131.50 is for attorney's fees for Watts. According to the judgment in its favor, the fees were for work from December

---

[21] Early in the underlying litigation, on November 18, 1999, counsel for the Human Rights Commission attempted to exclude certain members of the Club, who were not being deposed, from a deposition. Counsel for the Club responded that because the Club was a voluntary association all members of the Club could be liable for any judgment and, thus, all members were parties who were entitled to attend the deposition.

6, 2006, after the trial and while the case was pending in this Court, through May 2, 2008, the day that the Club obtained reinstatement of its corporate form. Watts obtained its judgment in January of 2009. The largest part of the fees, $446,852, was awarded to the attorneys for the plaintiffs in the discrimination litigation. These fees were awarded pursuant to 9 V.S.A. § 4506(b) to plaintiffs as prevailing parties. The remaining judgment amounts are $7401 each for compensatory and punitive damages for the individual plaintiffs, under 9 V.S.A. § 4506(a); a civil statutory penalty of $7200 to the Vermont Human Rights Commission, under 9 V.S.A. § 4553(a)(6)(A)(ii); and $10,000 for contempt of the October 6, 2006, injunction order to the Human Rights Commission.

¶ 69. The vast majority of the cases on reinstated corporations involve contractual liabilities with respect to business corporations. As the court reasoned in *Bloom*, the creditor typically entered into a contract believing it was dealing with an active corporation. Following reinstatement of the corporation, the creditor had the corporate liability it expected. Adding personal liability of persons who act for the corporation is a windfall, justified necessarily as deterrence of the conduct or omission that caused the termination of the corporation. These are cases covered by the dissent's rationale: "there is nothing inherently 'inequitable [in] requir[ing] corporate creditors that have dealt with individuals as agents of the corporation to seek relief solely from the corporation.'" *Post*, ¶ 103 (quoting 41 N.Y.U. L. Rev. at 607).

¶ 70. The circumstances here are totally different. The Club functioned as a voluntary association for nineteen years after its corporate status was terminated, far longer than in the vast majority of reported decisions we have found. Creditors dealt with it as a voluntary association, not as a corporation. This action does not arise out of a commercial transaction, and there is no evidence that creditors had an expectation of responsibility being exclusively corporate. Under Vermont law, the Club while acting as a voluntary association had the same liability as it had as a corporation, but the members had individual liability if the Club failed to pay a judgment against it. If anything, creditors relied upon that liability.

¶ 71. The circumstances behind each of the components of the judgments are also very different. We start with the largest

component of the judgments, the amount for attorney's fees for discrimination plaintiffs' counsel. The purpose of an award of attorney's fees is to encourage suits "to vindicate civil rights, and penalize[] those who violate the law." *State v. Whitingham Sch. Bd.*, 140 Vt. 405, 409, 438 A.2d 394, 396 (1981). Thus, entitlement to statutory attorney's fees "was fashioned in order to promote and encourage prosecution of . . . claims." *Gramatan Home Investors Corp. v. Starling*, 143 Vt. 527, 536, 470 A.2d 1157, 1162 (1983) (describing attorney's fees under the Consumer Fraud Act). As we said with respect to consumer fraud claims, "[t]he interests of both the business community and the public at large are best served by shifting the burden of the expense of consumer fraud litigation onto the shoulders of those whose unfair or fraudulent acts are responsible for the litigation in the first place." *Id.*

¶ 72. This case is a good example of the need for burden shifting. In order to vindicate plaintiffs' rights to be admitted to the Club and to recover a small judgment, their attorneys expended time and accrued expenses valued at almost $450,000. It is unlikely that a civil-rights plaintiff can bring this kind of case without a statutory attorney's fee provision to attract counsel. Counsel is necessarily depending upon the capacity of the defendant to pay an attorney's fee judgment in taking the case.

¶ 73. As we note above, this is not a case where creditors relied upon the presence of an active corporation prepared to pay a judgment and were unaware of the corporate termination. At least since early in the underlying litigation, plaintiffs were aware that the Club was actually an unincorporated voluntary association.[22] If anything, plaintiffs' counsel relied upon the wealth of the membership to pay a judgment.

¶ 74. The attorney's fees are a litigation expense, and the amount was made necessary by the scope of the litigation and the defense that the Club and its members mustered. The litigation continued over twelve years, including two appeals to this Court by the Club. The Club had a right to mount a strong and persistent defense, as it did, but the defense greatly increased the litigation expenses for plaintiffs. Moreover, the Club incurred more debt to finance the litigation, reducing the value of the joint assets available to pay a judgment.

---

[22] See *supra*, note 21.

154

■ ¶ 75. We conclude that under these circumstances it would be a clear abuse of the Club's status to deny liability of the members upon the reinstatement of the corporation. After operating for nineteen years as a voluntary association because of the termination of its corporate status, the Club reinstated its corporate status less than two months after the final judgment on the merits of the discrimination litigation. By that time, it knew that it faced a judgment of at least $25,000 and the future imposition of a large attorney's fee award against it. It then reinstated its corporate status, potentially eliminating the responsibility of members to pay the judgment if the Club could not do so. In essence, it was a bait and switch. Allowing this escape from liability would undercut the policy of eliminating financial barriers to enforcement of civil rights acts and encouraging counsel to take these cases.

■ ¶ 76. Our conclusion and reasoning are similar with respect to the civil penalty awarded to the Vermont Human Rights Commission pursuant to 9 V.S.A. § 4553(a)(6)(A)(ii). As we held in *State Agency of Natural Resources v. Riendeau*, 157 Vt. 615, 622, 603 A.2d 360, 364 (1991), the dual purposes of civil penalties are to make "noncompliance at least as costly as compliance" and to "reimburse the government for enforcement expenses and other costs generated by the violation." Only the second purpose is involved in this case. The length and complexity of the discrimination case drew extensive resources from the Commission, and the penalty amount reimbursed it for only a small percentage of the resources it expended. Our reasoning with respect to the attorney's fees for the individual discrimination plaintiffs applies equally to the civil penalties assessed for the Commission.

¶ 77. We similarly conclude that the reinstatement of the corporate status does not insulate officers, trustees, or members from liability for the judgment obtained by Watts. The Club stopped paying Watts for his services as of December 2006, essentially when the case was appealed to this Court for the second time. Thus, Watts handled the second appeal without compensation, continuing to provide services until he withdrew in mid-2008. Watts dealt with his client as an unincorporated association. Thus, Watts was providing legal services to the officers, trustees, and members to advance their interests as persons who could become personally liable for a judgment for the discrimination creditors. The Club regained its corporate form on the very

day that Watts withdrew from its representation. To allow the members to accept the personal benefit of the Watts representation and then seek a shield from personal liability for Watts' fees would be a clear abuse of the procedure for corporate reinstatement.

¶ 78. We turn then to the other components of the judgments. The easiest to resolve is the fine imposed against the Club for contempt. We held in *Horton v. Chamberlain*, 152 Vt. 351, 353-54, 566 A.2d 953, 954 (1989), that a corporate officer could be held in contempt and incarcerated for a failure of the corporation to appear as ordered, even though the officer was not a party to the litigation that resulted in the order and was never served with the order. We do not believe that restoration of the Club's corporate status can insulate appropriate persons from liability for a contempt fine.

¶ 79. We have a similar reaction to the punitive damages award.[23] Punitive damages are "designed to deter the wrongdoer from repeating the same or similar acts, and to punish intentional, deliberate, and malicious conduct." *City of Burlington v. Arthur J. Gallagher & Co.*, 173 Vt. 484, 488, 788 A.2d 18, 22 (2001) (mem.). The wrongdoer here is the Club, an association of individuals, which prevented the individual discrimination plaintiffs from becoming members of the Club because of their gender. To allow the members of that association to escape liability for punitive damages by reinstatement of the corporation would be unjust.

¶ 80. Having determined that the reinstatement of the corporate form did not insulate persons who are members, officers, or trustees from liability, we turn to the question of who could be personally liable to the creditors. As we discussed above, the Club was a voluntary association, and under our law the members are financially responsible if a creditor is unable to collect from the association. The trial court ruled that the creditors could not collect against the members of the Club. It noted that the Club had more than one thousand members at one point and that the precedents on which creditors relied allowed collection against "officers and directors rather than . . . ordinary members of an unincorporated association."

---

[23] The judgments for the individual discrimination plaintiffs include one dollar in compensatory damages for each. These amounts are de minimis, and we do not require a separate justification for these amounts.

¶ 81. The trial court relied particularly on the decision in *Karp v. American Legion Department of Connecticut, Inc.*, No. CV 930462879S, 1996 WL 457012 (Conn. Super. Ct. 1996). There, the court held that a tort judgment creditor could not proceed against members of an unincorporated voluntary association, which was a terminated corporation until its later reinstatement, under the controlling Connecticut statute. The court was moved by the fact that members in question were not officers. *Id.* at *2. That the precedents from other jurisdictions involve attempts to make officers or directors personally liable is to be expected, since all but a handful of the cases involve business corporations. In any event, the liability of persons who are affiliated with or manage terminated corporations must be decided under the law of the state involved. *Karp* held that, under a Connecticut statute, a reinstated corporation restored the limited liability of members of a corporation. *Id.* We have held to the contrary in this decision, interpreting our Vermont statute. Thus, we do not follow *Karp*.[24]

¶ 82. As we stated above in analyzing the liability of members of a voluntary association for judgment debts uncollectible from the association, *supra*, ¶ 55, we share the concern of the trial court that imposition of liability on all of the members of the Club may cause an injustice in the reverse direction. Due to the revocation of corporate status, individual members may have been unaware that they were members in a voluntary association in which they were ultimately liable for debts of the association. If they had joined the Club when it was incorporated and were unaware that the corporate status had subsequently been terminated, then they would have had no reasonable expectation of personal liability.

¶ 83. A number of courts have imposed liability on officers, directors, or shareholders only if they were aware that the corporation had been terminated. See *Steve's Equip. Serv, Inc. v. Riebrandt*, 459 N.E.2d 21, 24 (Ill. App. Ct. 1984); *Charles A. Torrence Co. v. Clary*, 464 S.E.2d 502, 504 (N.C. Ct. App. 1995); *Equipto Div. Aurora Equip. Co. v. Yarmouth*, 950 P.2d 451, 458 (Wash. 1998). We agree with the Illinois Court of Appeals that this

---

[24] Ironically, the Connecticut statute upon which *Karp* relies allows creditors to collect from members of a corporation for "fines or penalties duly imposed." *Karp*, 1996 WL 457012, at *2 n.2. It would allow collection from members of at least part of the judgments involved in this case.

is the better rule — that reinstatement of the corporate status will not restore the corporate shield on personal liability for a person who knew, or should have known by virtue of the person's position, that there was no corporate shield at the time of the act that created liability. See *Steve's Equip. Serv, Inc.*, 459 N.E.2d at 24. This rule conforms to the principle that the reinstatement provision should be interpreted in a manner that preserves the expectations of the parties at the time when the liability arose.

¶ 84. Finally, we must resolve whether our determination of the liability for the judgments provides creditors the relief they seek in this action. We recognize in this analysis that creditors have raised other issues that we resolved above. Here, we are addressing the counterclaim creditors filed alleging, among other things, that plaintiff is liable for the full extent of the judgments against the Club because he is a member of the Club. The counterclaim specified that in January 2009 the sheriff of Windsor County served a writ of execution for an unspecified amount on the Club, and in a separate paragraph that a writ of execution against the Club issued by the Washington Superior Court in the amount of $35,657.55 was returned unsatisfied. The paragraphs do not say that these writs are the same or that they came from the discrimination case. The amount specified in the counterclaim does not appear to match the amount of the judgments in the discrimination case.[25] There are no similar allegations in the Watts counterclaim.

¶ 85. The discrimination creditors did try to amend the counterclaim to allege the issuance of an unsatisfied writ of execution for the amount in the full discrimination case judgment, which included the attorney's fees. The amendment was denied as futile because it came after the court had granted summary judgment for plaintiff.[26]

---

[25] It seems closest in amount to that in the Watts judgment, but that judgment was issued by the Windsor Superior Court. Similarly, there was a writ of attachment by Bingo Supplies, Inc., but there is no indication that there was a judgment on which a writ of execution could issue, and the writ of attachment came from the Windsor Superior Court.

[26] We interpret the trial court's decision as granting summary judgment to plaintiff on discrimination creditors' counterclaim. The decision addressed the issues raised in the counterclaim, and the court said about the nearly identical Watts amended counterclaim that it "does not entitle the law firm to relief even if the factual assertions therein are taken as true."

¶ 86. Irrespective of what actually occurred here, we believe it is premature to determine whether creditors have the ability to collect any or all of its judgment from the Club. The record supports creditors' assertion that the primary asset of the Club is the property on which plaintiff is seeking to foreclose.[27] In the preliminary judgment proceeding, the Washington Superior Court noted:

> The current mortgage debt, which would have to be paid by any buyer at the sale, is around $527,000. The property was appraised in 1989 at $1,600,000, and the Elks had a contract to sell the building for $1,200,000 in 2006 that fell through. The bank believed in June that there was substantial value in excess of their mortgage.

In a footnote, the court noted that plaintiff estimated the value of the property at $700,000 to $750,000. The foreclosure judgment order the Windsor Superior Court issued in this case provides that the amount owed is $709,015.06, plus $173.11 per day from the April 9, 2010 date of the judgment. It is at least possible that the foreclosure proceeds will exceed the amount owed to plaintiff and will allow some amount to be distributed to creditors. That amount will be increased if the trial court holds on remand that plaintiff does not have priority for the amount of the optional advances.

¶ 87. The Club's equity of redemption on the property can be reached by an execution. 12 V.S.A. §§ 2781, 2795; see *Noyes v. Noyes*, 110 Vt. 511, 519, 9 A.2d 123, 127 (1939). The levying of the execution results in a public auction sale of the property, 12 V.S.A. § 2786, essentially the same result as the mortgage foreclosure produces. Whether done under the mortgage foreclosure decree or as a levy of execution, the public sale will determine whether creditors can collect from the assets of the Club. At that point, creditors can bring an action in contract against any or all of the members under 12 V.S.A. § 5060, provided that only one such action can be brought at a time.

¶ 88. Under these circumstances, we agree that the court should have issued a decree of foreclosure, containing a redemption

---

[27] The record in the discrimination case indicates that the discrimination creditors reached some liquid assets of the Club through trustee process but not nearly enough to satisfy the judgment.

provision, and in the absence of redemption, a provision specifying the responsibility of plaintiff to sell and the procedure and terms of the sale. The court acted properly in issuing the foreclosure decree it did, subject to possible amendment once the priority of the advances is determined.

¶ 89. We do not believe, however, that it was appropriate for the court to dismiss the counterclaims of discrimination creditors and Watts against plaintiff. Like plaintiff's request for a deficiency, any amount judgment creditors can obtain against plaintiff has to await the sale of the property and the financial reconciliation. If the proceeds available to creditors do not satisfy their judgments, reduced by any other funds they may have received from or on behalf of the Club, they may pursue their counterclaims. If creditors choose to pursue plaintiff for the unpaid judgment amounts, they must prove that plaintiff is a financially responsible member as defined in this decision: that is, with regard to any particular judgment, a member who knew, or should have known by virtue of his position, that the Club was not a corporation at the time that particular judgment accrued. These same elements would apply if creditors opt to collect from another member.

*Reversed and remanded for further proceedings consistent with the views expressed herein.*

¶ 90. **Cohen, Supr. J., Specially Assigned,** concurring. I concur fully in the Court's conclusion that reinstatement of the Club's corporate charter nineteen years after it was revoked and eleven years after the Club discriminated on the basis of gender should not operate retroactively to immunize individual members from liability for the discrimination. Having chosen for whatever reason to abandon their protection from individual liability until only a few short months after the discrimination judgment became final, the members' belated invocation of the corporate shield rings distinctly hollow. I cannot therefore, join in the dissent, which in my view effectively rewards such dilatory conduct by reinstating the corporate shield with no consideration of the surrounding circumstances.

¶ 91. It is the individual Club members who in this case should bear the cost of the discrimination, not the women wrongfully deprived of membership. Accordingly, I also concur in the Court's holding that the Club's creditors are statutorily authorized under

12 V.S.A. § 5060 to collect from the individual members, who remain "jointly and severally liable and may be sued individually or together" on the debt. *Ante,* ¶ 45.

¶ 92. I write separately, however, because in my view it is essential to take the decision one step farther. The result of today's ruling is that creditors may collect the entire judgment from any one or all of the members. See *State v. Therrien,* 2003 VT 44, ¶ 24, 175 Vt. 342, 830 A.2d 28 (joint and several liability means that each tortfeasor may be "held liable for the entire result" and that the plaintiff may "determine which tortfeasor to pursue for recovery" (quotation omitted)). Under the common law rule prohibiting contribution among joint tortfeasors, this also means that relatively wealthier Club members — even if only casually involved in Club activities — may be required to pay a significantly disproportionate share of the judgment regardless of fault. See *Swett v. Haig's, Inc.,* 164 Vt. 1, 5, 663 A.2d 930, 932 (1995) (observing that the Court has consistently rejected the right of contribution among joint tortfeasors). Although the Court readily acknowledges the potential inequity, it concludes that its hands are tied. As the Court explains, "the possibility of visiting liability on a mostly inactive Club member . . . seems an *inappropriate* result," but any remedy, the Court concludes, must be afforded by legislative action. *Ante,* ¶ 55 (emphasis added).

¶ 93. With respect, I do not agree that the Court is powerless to address this inequity. The inherent injustice in requiring one of several joint tortfeasors to pay more than his or her fair share of a judgment has been widely recognized. See generally J. Dillbary, *Apportioning Liability Behind a Veil of Uncertainty,* 62 Hastings L.J. 1729, 1731 (2011) (noting that "[t]he rule of joint and several liability . . . with no contribution has been lamented by scholars and policy makers as unjust, immoral, inefficient, and inequitable"). As a result, most states have adopted some form of contribution among joint tortfeasors, generally either by equal shares or shares proportionate to fault. *Id.* at 1732 ("Due to the fairness-between-tortfeasors concern, the majority of states allows some form of contribution based on pro-rata or fault.").

¶ 94. Many states, to be sure, have modified the rule against contribution by means of legislative action. See S. Randall, *Only in Alabama: A Modest Tort Agenda,* 60 Ala. L. Rev. 977, 979 (2009) (listing the states that have enacted legislation, often modeled on the Uniform Contribution Among Tortfeasors Act,

providing for contribution). The rule against contribution is a common law construct, however, and as such is also subject to *judicial* revision. See *Swett*, 164 Vt. at 5, 663 A.2d at 932 (noting that "contribution is unavailable under the common-law rule"); *Hiltz v. John Deere Indus. Equip. Co.*, 146 Vt. 12, 15, 497 A.2d 748, 751-52 (1985) (declining to reexamine "the common law rule barring contribution among joint tortfeasors" because it was unnecessary to address the issue on the facts presented). As the Supreme Court of Alaska has observed, in many states contribution is statutory, "[b]ut in a substantial number of states contribution has been developed as a matter of common law." *McLaughlin v. Lougee*, 137 P.3d 267, 277 (Alaska 2006). Indeed, many of the first states to modify the rule did so through court action, impelled by the "obvious lack of sense and justice in a rule which permits the entire burden of a loss . . . to be shouldered onto one [tortfeasor] alone, according to the accident of a successful levy of execution, the plaintiff's whim or malevolence, or his collusion with the other wrongdoer." *Davis v. Broad St. Garage*, 232 S.W.2d 355, 357 (Tenn. 1950) (quotation omitted); see generally *Bielski v. Schulze*, 114 N.W.2d 105, 108 n.2 (Wis. 1962) (listing states that led the way in recognizing the doctrine of contribution by court decision).

¶ 95. I recognize that the Court declined to abrogate the rule against contribution among joint tortfeasors in *Howard v. Spafford*, which relied on a similar preference for legislative over judicial action. 132 Vt. 434, 436-38, 321 A.2d 74, 75-77 (1974) (holding that the availability of various contribution schemes and the "complexities" surrounding the rule made reform "more appropriate for legislative than judicial consideration"); see also *Levine v. Wyeth*, 2006 VT 107, ¶ 39, 183 Vt. 76, 944 A.2d 179 (citing *Howard* in declining to require apportionment of negligence between drug manufacturer and hospital). It is hardly surprising, therefore, that none of the parties here have raised or briefed this issue.

¶ 96. Nevertheless, in my view *Howard* was wrong to opt for inaction on the basis merely of the issue's complexity, and in any event the issue is clearly ripe — after nearly forty years — for reconsideration. See *Hay v. Med. Ctr. Hosp. of Vt.*, 145 Vt. 533, 543, 496 A.2d 939, 945 (1985) (recognizing Court's duty to modify "outmoded common law concepts" even where a subject presents "difficult and complex" social or economic issues). Whether the

Court decides for pro rata or proportionate contribution among joint tortfeasors is less important than that it decides for contribution, and the Legislature may always step in if it disagrees with the Court's choice.

¶ 97. Accordingly, while I concur in today's decision, I would extend it to recognize a right of contribution among the individual Club members held liable on the judgment.

¶ 98. **Reiber, C.J.,** dissenting. In holding that members of the Club may be personally liable for a judgment against the Club, the majority disregard the settled rule — embodied in statute and endorsed by the weight of authority — that reinstatement of a suspended corporate charter revives the traditional corporate shield "as if the administrative dissolution had never occurred," 11B V.S.A. § 14.22(c), and thus relieves corporate officers and shareholders from personal liability for acts undertaken on behalf of the corporation during the period of suspension. The majority compounds the error by further finding that members of the Club, a nonprofit association, may be held personally liable under a rule that courts and commentators have generally applied only to for-profit business enterprises. As explained below, both holdings are fundamentally erroneous.

¶ 99. The acts which form the basis of the underlying judgment against the Club occurred when its corporate charter was suspended for failure to file an annual report. It was reinstated following the judgment. The operative reinstatement statute, which the majority concede is applicable to the Club, provides that reinstatement of an involuntarily dissolved nonprofit corporation "relates back to and takes effect as of the effective date of the administrative dissolution and the corporation shall resume carrying on its activities as if the administrative dissolution had never occurred." 11B V.S.A. § 14.22(c). This section, based on a provision in the Model Business Corporations Act, has been enacted in nearly identical form in numerous states, and its effect on the personal liability of corporate officers and shareholders for actions during the period of dissolution has been the subject of considerable comment. See 3 Model Business Corps. Act § 14.22, at 14-92-14-94 (3d ed. 2000). A leading treatise on corporate law observes that "[i]n most jurisdictions" where, as in Vermont, the reinstatement "relates back to the effective date of dissolution . . . directors or officers are *not personally liable* for actions under-

taken during the period of dissolution or suspension. Such matters become the exclusive liability of the corporation." 16A W. Fletcher, Cyclopedia of the Law of Corporations § 8117, at 228 (rev. vol. 2003) (emphasis added).[28]

¶ 100. The reason for absolving individual shareholders of any personal liability in these circumstances is evident from the statutory purpose and effect. Thus, a Kentucky court, construing a nearly identical reinstatement statute, explained that the legislative goal is to put the corporation in the same position it would have been in had it originally complied with its obligations under state law, so that upon reinstatement it is "as if the administrative dissolution . . . had never occurred." *Fairbanks Arctic Blind Co. v. Prather & Assocs.*, 198 S.W.3d 143, 146 (Ky. Ct. App. 2005) (quotation omitted). Therefore, "it naturally follows that members of such company are not individually liable for actions undertaken on behalf of the company during its dissolution." *Pannell v. Shannon*, No. 2010-CA-001172-MR, 2011 WL 3793415, at *4 (Ky. Ct. App. Aug. 26, 2011); accord *eServices, LLC v. Energy Purchasing, Inc.*, No. 11-198-JBC, 2012 WL 404957, at *1 (E.D. Ky. Feb. 6, 2012) (holding that under Kentucky law "administrative reinstatement also reinstates limited liability for acts taken during the period of dissolution" so that corporate officer was not personally liable on contracts signed while corporation was administratively dissolved).

¶ 101. The logic of this conclusion is compelling. As the federal court in *eServices* explained, under the reinstatement statute the corporation "is treated as having been in existence when the contracts were signed, complete with the corporate shield against personal liability, and [the corporate officer] is thereby relieved of any personal liability in the absence of reasons to pierce the corporate veil." 2012 WL 404957, at *2. Applying a similar statute

---

[28] Although the majority cites *Moore v. Occupational Safety & Health Review Commission*, 591 F.2d 991, 996 (4th Cir. 1979), for its statement that a "majority" of states retain personal liability in these circumstances, the assertion is in clear conflict with Fletcher and appears to be questionable. Moreover, the court in *Moore* was applying a Virginia statute which explicitly provided that reinstatement of the corporate charter "shall have no effect on any question of personal liability . . . in respect of the period between dissolution and reinstatement." *Id.* at 994; see generally *Nationwide Airlines (PTY) Ltd. v. African Global, Ltd.*, No. 3:04 CV 00768, 2007 WL 521155, at *14 (D. Conn. Feb. 14, 2007) (observing that "[n]umerous courts" have held that corporate officers are not personally liable for the corporation's actions during the dissolution period).

providing that upon reinstatement "the rights of such corporation shall be the same as though no forfeiture had been operative," the Michigan Supreme Court concluded that the legislative intent was to make actions taken "during the period of forfeiture corporate acts in the normal meaning of the term." *Bergy Bros., Inc. v. Zeeland Feeder Pig, Inc.*, 327 N.W.2d 305, 308-09 (Mich. 1982). "Thus, corporate obligations incurred during the period of forfeiture are binding upon the corporation, and only the corporation — individual members are no more liable than had the forfeiture not occurred." *Id.* at 309. The Missouri courts have reached a similar conclusion, reasoning that relieving corporate officers and shareholders of any personal liability for actions taken during the dissolution period was "more in consonance" with the legislative mandate that upon reinstatement the corporation may carry on as though "the corporate existence had never been interrupted" such that "the gap in corporate status is obliterated by the recission of the forfeiture." *Amoco Oil Co. v. Hembree*, 776 S.W.2d 68, 70 (Mo. Ct. App. 1989).

¶ 102. As noted, numerous courts have followed this logic to hold that reinstatement statutes placing the corporation in the same position it would have been in absent the dissolution revive the corporate shield from personal liability for obligations incurred during the dissolution period. See *Rocky Mountain Sales & Serv., Inc. v. Havana RV, Inc.*, 635 P.2d 935, 937 (Colo. App. 1981) (holding that, where effect of corporate reinstatement was to put corporation "in the same situation as it would have been in had it paid its franchise taxes . . . [i]t follows that . . . an officer . . . is not liable for what is here a purely corporate obligation") (quotations omitted); *Frederic G. Krapf & Son, Inc. v. Gorson*, 243 A.2d 713, 715 (Del. 1968) (holding that, under Delaware statute validating corporate acts upon reinstatement, creditor's remedy was solely "against the corporation"); *K & K Leasing, Inc. v. Tech Logistics Corp.*, No. 07-1599, 2008 WL 4724746, at *2 (Iowa Ct. App. 2008) (noting that, under reinstatement statute identical to Vermont's, corporate officers may "not be held individually liable for actions taken on behalf of the corporation during the period in which the corporate charter was forfeited if the charter is effectively reinstated at a later date"); *Barker-Chadsey Co. v. W.C. Fuller Co.*, 448 N.E.2d 1283, 1286 (Mass. App. Ct. 1983) (holding that revival of corporate charter "has the usual effect of confirming, as corporate acts, the acts of corporate officers in the interim

before revival, and correspondingly, of relieving the officers of personal liability").

¶ 103. To be sure, some courts have held otherwise, generally concluding that to disallow individual liability in these circumstances requires an affirmative statutory mandate. See, e.g., *Pepin v. Donovan*, 581 A.2d 717, 718 (R.I. 1990) (noting states that have relieved corporate officers of personal liability "pursuant to special statutory provisions mandating such a result"). Others have concluded that such a rule could "encourage fraud and abuse." *Poritzky v. Wachtel*, 27 N.Y.S.2d 316, 318 (Sup. Ct. 1941); see also *Estate of Plepel v. Industrial Metals, Inc.*, 450 N.E.2d 1244, 1246 (Ill. App. Ct. 1983) (concluding that disallowing personal liability for actions taken during dissolution period could permit corporate debts to "be easily evaded"). The reasoning of these decisions, however, has been criticized. As one court has explained, where a reinstatement statute allows the corporation to resume operating as though the dissolution had never occurred, "it does not need to explicitly provide for limited liability because the concept . . . is . . . an inherent part of a corporation 'carrying on its business.'" *eServices*, 2012 WL 404957, at *2. As for the concern over fraud and abuse, another commentator has cogently observed that there is nothing inherently "inequitable [in] requir[ing] corporate creditors that have dealt with individuals as agents of the corporation to seek relief solely from the corporation." Note, *Dissolution and Suspension as Remedies for Corporate Franchise Tax Delinquency: A Comparative Analysis*, 41 N.Y.U. L. Rev. 602, 607 (1966). Where there is real evidence of fraud, a court may simply apply the traditional remedy to "'pierce the corporate veil' and hold the directors personally accountable." *Id.*; see also *Prentice Corp. v. Martin*, 624 F. Supp. 1114, 1116 (E.D.N.Y. 1986) (questioning fraud rationale and applying New York reinstatement statute to limit plaintiff to his remedy against corporation); *Dep't 56, Inc. v. Bloom*, 720 N.Y.S.2d 920, 922-23 (Sup. Ct. 2001) (characterizing fraud rationale as "fallacious" and rejecting notion that corporate officer would "purposefully allow his corporation to be dissolved" to perpetrate fraud on creditors).

¶ 104. The majority here fails to discuss the rule followed in most jurisdictions that have enacted reinstatement statutes similar to Vermont's, and does not explain why the rule should not be applied here to revive the corporate shield and relieve the officers and members of the Club from any personal liability. Nor indeed

does the majority address the several decisions that take the opposite approach, imposing personal liability in the absence of a clear statutory statement to the contrary. Concluding, instead, that "it is unwise to adopt" any single rule, *ante*, ¶ 61, the majority fashions a novel approach derived from several New York trial court rulings notwithstanding the fact that, as one federal court has charitably observed, "[t]here is no consistent pattern in the holdings of the New York Courts on the matter." *Prentice*, 624 F. Supp. at 1115. Under this approach, the majority concludes that whether corporate reinstatement will shield members from personal liability "must depend on the reasonable expectations of the parties at the time the liability arises," which in turn "will be shaped by the context in which the liability arises," which further depends on a number of factors, including "especially the nature of the obligation, the parties' knowledge, and the timing of the corporate termination and the liability." *Ante*, ¶ 61. The "liability" factor apparently refers to the nature of the monetary award, i.e., whether it involves compensatory damages, punitive damages, civil statutory penalties, or attorney's fees, although "[t]he circumstances behind each of the components of the judgments" may also affect the decision to impose personal liability. *Ante*, ¶ 71.

¶ 105. While undoubtedly clear to the majority, I am compelled to confess that I do not fully understand this multivariate, "expectations" dependent, "contextual" approach to determining whether and under what circumstances personal liability will attach to individuals for actions taken during the period of dissolution and prior to corporate reinstatement. I suspect, moreover, that future litigants may experience equal difficulty parsing and applying the majority holding. What is clear, however, is that nothing in the majority opinion explains why we should not apply the settled, straightforward rule that a corporate reinstatement which statutorily "relates back" to the date of dissolution and allows the corporation to carry on "as if the administrative dissolution had never occurred," 11B V.S.A. § 14.22(c), revives the preexisting corporate shield and thus precludes the imposition of personal liability on the individual members of the Club in this case.

¶ 106. Even assuming, however, that the corporate shield does not apply, many of the Club members could still be immune from personal liability. In holding that individual members of an unincorporated association — the Club's status during the disso-

lution period — may be liable for any unpaid portion of the judgment, the majority relies principally on 12 V.S.A. § 5060 and the caselaw construing it. The statute provides that any unsatisfied portion of a judgment "against a partnership, association or company . . . may be brought against any or all of the partners, associates or shareholders." 12 V.S.A. § 5060. The statute dates from the nineteenth century, and the cases on which the majority relies are nearly as old; the principal decision, *F.R. Patch Manufacturing Co. v. Capeless*, was decided more than 100 years ago. 79 Vt. 1, 63 A. 938 (1906). As the majority notes, that case likened the members of the Protection Lodge, No. 215, International Association of Machinists, an unincorporated association, to that of partners in a "large partnership," *id.* at 6, 63 A. at 939, observed that "at common law" the rights and liabilities of a partnership "are the rights and liabilities of the partners, and are enforceable by and against them individually," *id.* at 10, 63 A. at 940, and concluded therefore that its members were individually liable under the statute for the unsatisfied portion of a judgment against the Protection Lodge. *Id.*

¶ 107. Although the fraternal association in *Capeless* appears to have been not for profit, the Court did not consider any potential distinction between business and nonprofit enterprises. The *Capeless* Court did, however, place considerable reliance on common-law principles in applying the statute, and the common law over the past 100 years has shown an increasing concern with precisely this issue. Indeed, for purposes of imposing individual liability, most courts and commentators today draw a clear distinction between profit and not-for-profit unincorporated associations. One leading treatise, for example, explains that an unincorporated association "formed for conducting business for the purpose of profit" is generally treated as "a partnership, and the liability of the individual members upon the debts incurred . . . on behalf of the association . . . is governed by the law of partnership." 12 R. Lord, Williston on Contracts § 35:72, at 544 (4th ed. 1999). In contrast, "associations, societies, and clubs, organized for objects which are social, moral, patriotic, political, or the like, rather than for purposes of trade or profit, are not considered to be partnerships even as to third persons . . . and pecuniary liability can be fastened on the individual members only by reason of the acts of such individuals . . . , as none is implied from the mere fact of association." *Id.* at 547-48. In view of the

beneficial or charitable purposes of such associations, and their often informal level of organization, most courts have been loath to impose the risks of personal liability on members based on mere membership alone. *Id.*; see, e.g., *Stege v. Louisville Courier Journal Co.*, 245 S.W. 504, 504 (Ky. 1922) (explaining that "[o]rdinarily members of a voluntary organization or association are not liable for such bills, if such society be not engaged in a business enterprise . . . but . . . is organized for moral, social, beneficial, literary, scientific, political, or other like purposes, and the individual members of such an organization are not partners, so that the acts of one binds all").

¶ 108. Caselaw to this effect is uniform and extensive. Thus, a frequently cited federal decision, broadly canvassing the common law governing "unincorporated nonprofit associations," has summarized that "[p]ursuant to this law, an individual is not liable for the debts of the association merely because of his status as a member or officer of the association." *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1284 (5th Cir. 1994). Rather, "principles of the law of agency" apply, so that a member is responsible only if the member personally ratified the association's action. *Id.* "[I]t is important to remember at all times," however, "that this standard differs from the one that governs the liability of members of unincorporated associations organized for profit or to conduct a business, which standard determines liability of members under the principles of partnership law." *Id.* at 1285; accord *Security-First Nat'l Bank of Los Angeles v. Cooper*, 145 P.2d 722, 729 (Cal. Ct. App. 1943) (holding that individual liability of members of unincorporated association depends on "whether the association is one organized for profit," and that members of nonprofit association "are not liable as partners"); *Thomas v. Dunne*, 279 P.2d 427, 432 (Colo. 1955) (refusing to "subscribe to the proposition that one who becomes a member of an unincorporated association such as a fraternal organization . . . subjects himself to liability . . . in the absence of any allegation . . . that he took an active part in the act resulting in the injury or . . . gave [his] assent"); *Guyton v. Howard*, 525 So. 2d 948, 956 (Fla. Dist. Ct. App. 1988) (holding that "liability of a member of an unincorporated fraternal or social association is based upon his direct, active negligence" and cannot be "imputed"); *Victory Comm. v. Genesis Convention Ctr.*, 597 N.E.2d 361, 364 (Ind. Ct. App. 1992) (observing that "states have uniformly applied the

common law" rule that members of not-for-profit unincorporated association are liable only if they personally ratify association's action); *Libby v. Perry*, 311 A.2d 527, 533-34 (Me. 1973) (recognizing "the distinction between voluntary associations set up for purely commercial profit-making purposes and those organized for fraternal or social ends" and holding that individual members of the latter "do not, merely by virtue of their membership in such association, subject themselves to liability for injuries sustained as a result of the negligent conduct of their associates or their agents"); *Shortlidge v. Gutoski*, 484 A.2d 1083, 1086 (N.H. 1984) (noting distinction between unincorporated associations organized for profit whose members are treated as partners and are "thereby jointly liable" and association not organized for profit in which "[m]ere membership . . . , without more, will not generally be sufficient to attach liability" for debts of the association); *Lyons v. Am. Legion Post No. 650 Realty Co.*, 175 N.E.2d 733, 736-37 (Ohio 1961) (noting the "recognized difference . . . between an unincorporated association organized for the transaction of business and one organized for fraternal or social purposes" and observing that members of the former are treated "as partners" while those of the latter are not "in its nature that of partners" (quotations omitted)); *Duquesne Litho, Inc. v. Roberts & Jaworski, Inc.*, 661 A.2d 9, 11 (Pa. Super. Ct. 1995) (recognizing that voluntary associations organized for political purposes "are not partnerships" and that a member "will only be personally liable for . . . debts if he actually authorized, assented to, or ratified the obligation" (quotation omitted)); *Blair v. S. Clay Mfg. Co.*, 121 S.W.2d 570, 572 (Tenn. 1938) (holding that individual liability of association members "depends on the character of the organization," and that if "profit and loss is not contemplated, such as literary, social or political organizations, its members are not treated as partners and their liability . . . is determined upon principles of agency").

¶ 109. Although this is the rule in most jurisdictions, the majority nevertheless assails it as "unfair" because it would require the creditors to prove participation or ratification by the individual members, a difficult hurdle in this case where the votes were conducted by secret ballot. The majority also expresses concern that the rule would unfairly require the creditors to prove discriminatory conduct "a second time." *Ante*, ¶ 52. This is simply an evidentiary issue, however, and the short and simple answer in

such a case is to place the burden on the individual members to show that they did not actively participate in the decision or later ratify it. The unfairness cited by the majority is illusory.

¶ 110. Although the Club was found to be a "public accommodation" for · purposes of liability under the Fair Housing and Public Accommodations Act, 9 V.S.A. §§ 4500-4507, this finding was based principally upon its membership "selectivity," *Human Rights Comm'n v. Order of Elks*, 2003 VT 104, ¶ 20, 176 Vt. 125, 839 A.2d 576, and does not otherwise convert an association organized for fraternal, nonprofit pursuits into a for-profit business enterprise for purposes of determining individual liability. See *id.* ¶ 4 (noting that the Club is a subordinate lodge of the "largest benevolent fraternal order in America"). Thus, under the general principles articulated above, the only basis for holding any individual Club members liable is if they personally participated in the decision to deny membership to the plaintiffs because of their gender, or otherwise ratified that decision. *Lyons*, 175 N.E.2d at 737 (affirming rule that members of nonprofit unincorporated association are individually liable only for transactions they personally authorized or later ratified); 12 Williston, *supra*, § 35:72, at 548-49 (noting general rule that member of nonprofit association is individually "liable only so far as he or she has personally assented to the transaction in question"). That should be the only relevant liability issue for determination on remand.

¶ 111. The majority acknowledges that its decision to impose personal liability on members of organizations such as the Club might seem unfair, but concludes that it is the responsibility of the Legislature to address the problem. Such deference is commendable when the Legislature has stated its intentions in clear and unmistakable terms. Here, however, the nineteenth-century statutory language referring to judgments against an "association" is nonspecific and virtually invites interpretation in light of evolving common law principles. 12 V.S.A. § 5060. Indeed, the seminal decision on which the majority relies, *Capeless*, explicitly analogized the association in question to a partnership, and applied common-law partnership principles in deciding to impose joint and several liability on its members under the statute. It is equally legitimate, a century later, to reinterpret that provision in light of the overwhelming authority rejecting the partnership analogy where, as here, the association is organized for social or benevolent purposes.

¶ 112. For all of the foregoing reasons, therefore, I respectfully dissent. I am authorized to state that Justice Burgess joins this dissent.